24 N.Y.2d 427 (1969)
Josephine Flanagan, Appellant,
v.
Mount Eden General Hospital et al., Respondents.
Court of Appeals of the State of New York.
Argued February 18, 1969.
Decided April 17, 1969.
Joseph P. Napoli and Harry H. Lipsig for appellant.
William F. McNulty for Mount Eden General Hospital, respondent.
George van Setter for Sarah Lee Ancell and another, respondents.
Chief Judge FULD and Judges BURKE and BERGAN concur with Judge KEATING; Judge BREITEL dissents and votes to affirm in an opinion in which Judges SCILEPPI and JASEN concur.
*428 KEATING, J.
Josephine Flanagan, in June of 1958, was under the care of Dr. Max Eisenstat for a gall bladder ailment. Dr. Eisenstat determined that an operation was necessary, and the plaintiff entered Mount Eden General Hospital for that purpose. On July 14, 1958 the operation was performed. During the course of the operation surgical clamps were inserted in the plaintiff's body.
In the spring of 1966 the plaintiff experienced severe pain in the region of her abdomen. She consulted a doctor. He advised her on June 3, 1966 that surgical clamps were discovered by X-ray analysis to be lodged in her body. On June 10, 1966 an operation was performed to remove the clamps.
An action was commenced on October 20, 1966 by the service of a summons and complaint upon the defendant, Mount Eden *429 General Hospital and by the service of a summons and complaint upon the estate of the doctor on November 2, 1966. The complaint alleged that the clamps were carelessly and negligently allowed to remain within her body after the gall bladder operation and that they were not discovered or could not have been discovered by the plaintiff until June of 1966.
Both defendants (the executors of the Eisenstat estate and the hospital) separately moved to dismiss the plaintiff's complaint on the ground that the Statute of Limitations barred the institution of the action. Special Term dismissed the complaint as to each defendant. The Appellate Division, First Department, unanimously affirmed without opinion. We granted leave to appeal.
This appeal presents the narrow question: when should the Statute of Limitations begin to run in a foreign object medical malpractice case?
At common law there was no fixed time for the bringing of an action. Personal actions were merely confined to the joint lifetimes of the parties. The Statute of Limitations was enacted to afford protection to defendants against defending stale claims after a reasonable period of time had elapsed during which a person of ordinary diligence would bring an action. The statutes embody an important policy of giving repose to human affairs. (Schwartz v. Hayden Newport Chem. Co., 12 N Y 2d 212.) "The primary consideration underlying such legislation is undoubtedly one of fairness to the defendant. There comes a time when he ought to be secure in his reasonable expectation that the slate has been wiped clean of ancient obligations, and he ought not to be called on to resist a claim where the `evidence has been lost, memories have faded, and witnesses have disappeared."' (Developments in the Law Statutes of Limitations, 63 Harv. L. Rev. 1177, 1185.)
The Supreme Court has noted that Statutes of Limitation "are founded upon the general experience of mankind that claims, which are valid, are not usually allowed to remain neglected. The lapse of years without any attempt to enforce a demand creates, therefore, a presumption against its original validity, or that it has ceased to subsist. This presumption is made by these statutes a positive bar; and they thus become statutes of repose, protecting parties from the prosecution of *430 stale claims, when, by loss of evidence from death of some witnesses, and the imperfect recollection of others, or the destruction of documents, it might be impossible to establish the truth." (Riddlesbarger v. Hartford Ins. Co., 74 U. S. 386, 390.)
In 1930 we affirmed, without opinion, a decision of the Appellate Division in which it held that in a foreign object medical malpractice case the Statute of Limitations begins to run from the commission of the act (Conklin v. Draper, 229 App. Div. 227, affd. 254 N.Y. 620). At the time we considered Conklin no other jurisdiction had a contrary rule.
Just recently in Schwartz v. Hayden Newport Chem. Co. (12 N Y 2d 212, supra) we had an opportunity to review when the Statute of Limitations should run for medical malpractice treatment cases. In Schwartz, unlike the Conklin case, we were confronted with a plaintiff who alleged that a chemical preparation manufactured by the defendant, which was injected into the plaintiff's sinus, in order for his sinus to be X-rayed, caused a carcinoma which required the removal of an eye. He instituted an action claiming the medication was negligently prepared. We held that the cause of action for the purpose of the Statute of Limitations accrued at the time that the chemical was injected into the plaintiff's body.
Our decision in Schwartz did not involve review of the precise issue presented by this appeal. A comparison of the alleged medical malpractice in Schwartz and that presented by this appeal points to an obvious distinction which is compatible with the underlying purpose of the Statute of Limitations and consistent with the rationale of Schwartz.
It is clear now that a fundamental difference exists, for the purpose of the Statute of Limitations, between negligent medical treatment and medication cases and cases involving negligent malpractice of physicians or hospitals in which a foreign object is left in a patient's body. In the latter no claim can be made that the patient's action may be feigned or frivolous. In addition, there is no possible causal break between the negligence of the doctor or hospital and the patient's injury.
The so-called discovery rule employed in foreign object medical malpractice cases is in compatible harmony with the purpose for which Statutes of Limitation were enacted and strikes *431 a fair balance in the field of medical malpractice. The unsoundness of the traditional rule, as applied in the case where an object is discovered in the plaintiff's body, is patent. "It simply places an undue strain upon common sense, reality, logic and simple justice to say that a cause of action had `accrued' to the plaintiff until the X-ray examination disclosed a foreign object within her abdomen and until she had reasonable basis for believing or reasonable means of ascertaining that the foreign object was within her abdomen as a consequence of the negligent performance of the [operation]". (Morgan v. Grace Hosp., 149 W. Va. 783, 792.)
In the case before us, the danger of belated, false or frivolous claims is eliminated. In addition, plaintiff's claim does not raise questions as to credibility nor does it rest on professional diagnostic judgment or discretion. It rests solely on the presence of a foreign object within her abdomen.
The policy of insulating defendants from the burden of defending stale claims brought by a party who, with reasonable diligence, could have instituted the action more expeditiously is not a convincing justification for the harsh consequences resulting from applying the same concept of accrual in foreign object cases as is applied in medical treatment cases. A clamp, though immersed within the patient's body and undiscovered for a long period of time, retains its identity so that a defendant's ability to defend a "stale" claim is not unduly impaired.
Therefore, where a foreign object has negligently been left in the patient's body, the Statute of Limitations will not begin to run until the patient could have reasonably discovered the malpractice.
There is a sharp and approximately evenly divided conflict in authorities on this issue in this country. Nine jurisdictions limit the discovery rule to cases where a foreign object has been negligently left in the patient's body.[1] Eleven have adopted the discovery test for all malpractice cases regardless of whether *432 a foreign object is involved.[2] Two States have adopted the discovery rule by statute.[3] The courts in 21 States do not apply a discovery rule, holding that the cause of action accrues from the commission of the malpractice.[4]
We are more convinced, however, by the basic logic of the discovery rule than the numbers of jurisdictions which support that view. It is not only an equitable rule but also entirely consistent with the underlying purpose of the Statute of Limitations. (Lillich, The Malpractice Statute of Limitations in New York's New Civil Practice Law and Rules, 14 Syracuse L. Rev. 42; Lillich, The Malpractice Statute of Limitations in New York and Other Jurisdictions, 47 Corn. L.Q. 339; Note, Limitations in Professional Malpractice Actions, 28 Maryland L. Rev. 47.)
An argument is made that the failure of the Legislature to pass bills which were suggested by the Law Revision Commission, in order to ameliorate the interpretation given the Statute of Limitations in Conklin, indicates a legislative intent to have our interpretation frozen. This argument rests on unsure ground. No one knows why the Legislature did not pass a proposed measure. Admittedly, if the bill had been discussed in both houses and defeated, this would be an indication of the Legislature's purpose. With regard to the particular proposals before the Legislature, however, no such consideration *433 ever took place. Just recently a bill providing for a discovery rule was acted upon favorably by the Assembly only to fail to be reported out of a Senate committee. Are we to hold that a majority of a legislative committee, who give no reason for their failure to allow the whole body to vote on a measure, impart a legislative judgment which must be transmuted into a conclusive legislative intent? "The practicalities of the legislative process furnish many reasons for the lack of success of a measure other than legislative dislike for the principle involved in the legislation. Legislative inaction is a weak reed upon which to lean in determining legislative intent." (Berry v. Branner, supra, p. 311).[5]
*434 Our decision does not encroach upon any legislative prerogatives. The Legislature did not provide that the Statute of Limitations should run from the time of the medical malpractice. This court did. Therefore, a determination that the time of accrual is the time of discovery is no more judicial legislation than was the original determination. Granted, the Legislature could have acted to change our rule; however, we would surrender our own function if we were to refuse to deliberate upon unsatisfactory court-made rules simply because a period of time has elapsed and the Legislature has not seen fit to act.
In Woods v. Lancet (303 N.Y. 349) we overruled a venerable precedent in order to give an injured child a cause of action for injuries occurring when it was a fetus. This despite legislative inaction. In Woods we stated: "Surely, as an original proposition, we would, today, be hard put to it to find a sound reason for the old rule * * * Of course, rules of law on which men rely in their business dealings should not be changed in the middle of the game, but what has that to do with bringing to justice a tort-feasor who surely has no moral or other right to rely on a decision of the New York Court of Appeals? Negligence law is common law, and the common law has been molded and changed and brought up-to-date in many another case. Our court said, long ago, that it had not only the right, but the duty to re-examine a question where justice demands it (Rumsey v. New York & N. E. R. R. Co., 133 N.Y. 79, 85, 86, and see Klein v. Maronelas, 219 N.Y. 383)." (Id., p. 354.)
Similarly, in Greenberg v. Lorenz (9 N Y 2d 195) we noted that, in a case in which recovery was allowed a member of the purchaser's household for a breach of implied warranty of fitness for use, despite repeated inaction on the part of the Legislature, "the present rule which we are being asked to modify is itself of judicial making since our statutes say nothing at all about privity, and in early times such liabilities were thought to be in tort * * * Alteration of the law in such matters has been the business of the New York courts for many years." (Id., pp. 199-200; see, also, Gelbman v. Gelbman, 23 N Y 2d 434; Millington v. Southeastern Elevator Co., 22 N Y 2d 498: Gallagher v. St. Raymond's R. C. Church, 21 N Y 2d 554; Battalla v. State of New York, 10 N Y 2d 237; Bing v. Thunig, 2 N Y 2d 656.) In all these cases, this court overruled long-standing *435 precedents despite years of legislative inactivity during which the Law Revision Commission presented a number of studies to the Legislature urging remedial legislation (see, e.g., Woods  1935 Report of N. Y. L. Rev. Comm. p. 451; Greenberg  1943 Report, p. 409; 1945 Report, p. 23; 1959 Report, p. 59; Battalla  1936 Report, pp. 375-382, 1026).
Courts and legislatures need not be viewed as antagonists in the area of tort law. Developing the law is the province of both, and the peculiar attributes of these institutions are complementary in getting the task performed. Judicial action is often necessary to bring to the attention of the Legislature a particular problem in order for it to accomplish the necessary reform which only legislative action can fashion (Cowan, Rule or Standard in Tort Law, 13 Rutgers L. Rev. 141, 159-160; Keeton, Judicial Law Reform  A Perspective on the Performance of Appellate Courts, 44 Texas L. Rev. 1254; Keeton, Creative Continuity in the Law of Torts, 75 Harv. L. Rev. 463; Peck, the Role of the Courts and Legislatures in the Reform of Tort Law, 48 Minn. L. Rev. 265; Mishkin and Morris, On Law in Courts, 316 [1965]).
Where a court makes what appears to be a needed adjustment in an area in which the Legislature has failed to act, the Legislature is not thereby foreclosed from action. (Wong Yang Sung v. McGrath, 339 U. S. 33, 47; Yoshizaki v. Hilo Hosp., 433 P. 2d 220, 224, supra; Holytz v. City of Milwaukee, 17 Wis. 2d 26; Spanel v. Mounds View School Dist., 264 Minn. 279.) The Legislature, because of its flexibility, may wish, after consideration, to place an outside limit on bringing a cause of action in foreign object cases and may also wish to review the applicable time for the running of the Statute of Limitations for medical malpractice medication and treatment cases. Such action will, of course, be entirely appropriate as is ours, in the absence of legislative mandate.
Accordingly, the order of the Appellate Division should be reversed. The defendants' motions to dismiss the complaint should be denied.
BREITEL, J. (dissenting).
This appeal involves the vexing problem of whether a cause of action for medical malpractice should accrue sometime after the commission of the malpractice, thus circumventing the short Statute of Limitations of three *436 years, traditionally measured from time of commission, as is true of most torts (CPLR 214, subd. 6). The issue is a vexing one when, as here, the plaintiff alleges that she did not discover the wrong committed against her until long after the statute had run and barred her action. But a judicial resolution of the issue is embarrassed by twin factors: a statute and not a decisional rule of the common law is involved; and the Legislature and legislatively created commissions have several times and quite recently addressed themselves to the issue. Hence, not only the problem of ascertaining the just rule is present, but there is also involved paramount delineation of the judicial and legislative functions.
In July, 1958 plaintiff was operated on by Dr. Max Eisenstat, now deceased, for a gall bladder ailment at the Mount Eden General Hospital. During the operation clamps were inserted in plaintiff's abdomen and were not removed. In June, 1966 plaintiff was first correctly diagnosed as sustaining injury from the clamps and on June 10 of that year, in a new operation, the clamps were removed. She brought this action against the hospital and the estate of the deceased surgeon, Dr. Eisenstat, on October 20, 1966, over eight years later.
If there were complete freedom to evolve a rule in a case of this kind, the dissenters would abjure a short Statute of Limitations running from the commission of the wrong in any medical malpractice case. This would be particularly so in a case where a foreign object has been left negligently in the body of a patient, when the dangers of fraudulent claim or lack of causal relation are minimal. For that matter, the same conclusions, for different reasons, would probably apply where a medical practitioner fails to disclose the fact of treatment malpractice either known to him or inferable by him from the consequences of a treatment or surgical procedure. A better rule would be a limitation running from discovery by the patient, with perhaps, as recommended to and considered by the Legislature, a five or six-year outside limit from the time of commission, or perhaps even 10 years. Indeed, because the foreign object cases are in a class by themselves, they might well be placed in a separate category providing the longest outside limit or none at all.
But courts, it is submitted, are not free to devise their own rules in a statutory field merely because their sense of justice *437 impels them. Courts do not sit as councils of revision on the legislative product. Courts have most often held that they are precluded from affirmative action and from departing from their own prior decisions construing statutes, especially when the Legislature or the Congress has recently or repeatedly considered the matter. Thus, the Supreme Court has on a number of occasions in respect to the antitrust statutes abstained from active intervention because of Congressional activity or consideration. (e.g., Toolson v. New York Yankees, 346 U. S. 356, 357; Apex Hosiery Co. v. Leader, 310 U. S. 469, 488). In another context, the Supreme Court said: "The injustice and confusion incident to the doctrine of Swift v. Tyson [16 Pet. (41 U. S.) 1] have been repeatedly urged as reasons for abolishing or limiting diversity of citizenship jurisdiction. Other legislative relief has been proposed. If only a question of statutory construction were involved, we should not be prepared to abandon a doctrine so widely applied throughout nearly a century [footnotes omitted]." (Erie R. Co. v. Tompkins, 304 U. S. 64, 77.) (See, generally, Friedmann, Legal Philosophy and Judicial Lawmaking, 61 Col. L. Rev. 821, 834-839; The Effect of an Unsuccessful Attempt to Amend a Statute: A Correspondence Between Charles H. Willard and John W. MacDonald, 44 Corn. L.Q. 336; Moffat, The Legislative Process, 24 Corn. L.Q. 223, 229-230; Horack, Congressional Silence: A Tool of Judicial Supremacy, 25 Texas L. Rev. 247; Note, 59 Harv. L. Rev. 1277, 1280-1281; Friedmann, Legal Theory [5th ed.], pp. 500-506.)
Where, however, the rule is one of judicial and not legislative origin, then "Legislative action there could, of course, be, but we abdicate our own function, in a field peculiarly nonstatutory, when we refuse to reconsider an old and unsatisfactory court-made rule" (Woods v. Lancet, 303 N.Y. 349, 355). Thus, in Woods v. Lancet, the court acted, although it recognized that an extensive Law Revision Commission study had been made and transmitted to the Legislature, "without making any recommendations in the matter for the present" (1935 Report of N. Y. Law Rev. Comm., p. 451). And, in Battalla v. State of New York (10 N Y 2d 237), the court overruled a long-standing precedent in face of legislative inaction. In 1936 the Law Revision Commission had submitted a proposed bill to allow recovery for injuries resulting from fright or shock which failed to pass *438 either house (1936 Report of N. Y. Law Rev. Comm., pp. 375-382, 1026). The court recognized that the challenged rule was Judge made and, therefore, one that Judges could abandon.
In Greenberg v. Lorenz (9 N Y 2d 195) the court, expressly noting that the Legislature had failed to enact successive recommendations of the Law Revision Commission in 1943, 1945, and 1959, allowed a member of the purchaser's household a cause of action for breach of the implied warranty of fitness for use (Personal Property Law, § 96, subds. 1, 2). The court stated: "The present rule which we are being asked to modify is itself of judicial making since our statutes say nothing at all about privity and in early times such liabilities were thought to be in tort * * * Alteration of the law in such matters has been the business of the New York courts for many years" (pp. 199-200). It is well recognized, then, that the court's broadest lawmaking powers fall within the ambit of common-law or decisional rules (see, also, Gelbman v. Gelbman, 23 N Y 2d 434; Millington v. Southeastern Elevator Co., 22 N Y 2d 498). Of course, in some instances where recommendations of the Law Revision Commission are not enacted, the study has been helpful in identifying the problem and instrumental in effecting change when the problem is again presented to the courts (MacDonald, Legal Research Translated into Legislative Action  The New York Law Revision Commission 1934-1963, 48 Corn. L.Q. 401, 452).
On the other hand, the courts are possessed of intermediate lawmaking powers in areas where the Legislature has acted but has deliberately abstained from providing detail. Here the courts are free to evolve the rules within legislatively enacted statutory limits (e.g., People v. Williams, 24 N Y 2d 274 [construing Family Ct. Act, § 812]; Goldstein v. State of New York, 281 N.Y. 396 [applying broad mandate of Court of Claims Act, former § 12-a, now § 8]; see, also, Uniform Commercial Code, § 2-302, subd. [2] which expressly requires the courts to apply a broad doctrine of unconscionability in the enforcement of contracts; see Cardozo, The Nature of the Judicial Process, pp. 113-115, 126-130).
A much more difficult problem of scope for judicial innovation remains in statutory areas where by legislative inaction it is unclear whether the inaction is a signal for the courts to resolve *439 the matter or merely that the Legislature has failed to consider the matter and is not relinquishing its responsibility in the area.
The present case and statutes involved fall in none of the categories last discussed.
The malpractice limitation statute is an old one in this State. It was first enacted in 1900 (L. 1900, ch. 117, amdg. Code Civ. Pro.). Prior to that malpractice actions were classified for limitation purposes with other personal injury actions (1962 Report of N. Y. Law Rev. Comm., p. 237, n. 1).
For many years the Bar, and, alternatively, the Legislature or its agencies have been concerned and critical of the harsh consequences resulting from the short Statute of Limitations in medical malpractice cases. In 1958 the Association of the Bar of the City of New York through its Committee on Medical Jurisprudence, recommended a change in the then two-year statute which commenced with the commission of the wrong (13 Record of Assn. of Bar of City of N. Y., 465). As far back as 1942 the Law Revision Commission had recommended a limitation statute of one year after discovery with an outside limit of six years after the commission of the wrong (1942 Report of N. Y. Law Rev. Comm., pp. 141-143, 772). More recently, the commission recommended a change to accrue the action from time of discovery but in no event allowing an action brought later than six years from the occurrence of the malpractice (1962 Report, pp. 227-285). This recommendation was based on an extensive study in depth covering the cases, the commentaries, and the statutes throughout the nation. The 1962 proposed legislation, like that of 1942, was not passed by the Legislature (1962 Report, supra, pp. 227-285, 727).
Last year, in 1968, a bill was again introduced, this time to accrue the action from the time of discovery but to limit the bringing of the action to within five years from the occurrence of the malpractice. The bill passed the Assembly but was not reported out of committee in the Senate (1968 N. Y. Legis. Record and Index, pp. A. 64 [A. Int. 689], S. 416 [S. Int. 4497]).
In the meantime, the draftsmen of the CPLR had changed the old two-year statute to a three-year period of limitations, but, for practical reasons, left the discovery proposal by the wayside (CPLR 214, subd. 6; Civ. Prac. Act, § 50, subd. 1; 1 Weinstein-Korn-Miller, N. Y. Prac., par. 214.17 et seq., but esp. par. *440 214.21). The decision was made despite the observation that often the fact of malpractice "is not known promptly to the person injured" (2d Report, N. Y. Legis. Doc., 1958, No. 13, p. 538).
This sketchy history amply demonstrates that the malpractice limitation problem is not one that has been ignored by the Legislature for the past 69 years. On the contrary it has been the subject of repeated attention, legislative enactment, and amendment, with uninterrupted reliance on judicial precedents applying and interpreting the relevant statutes for 70 years. Consequently, the only ground on which the courts, at this time, could purport to overrule or avoid the statute and its impact must be to exercise some super-legislative power of statutory revision. To characterize such a change of the law as merely interpretation or reinterpretation of a statute, in the light of its judicial and legislative history, is disingenuous.
Moreover, there are no new arguments or data suggested. The distinctions and distinguishable consequences among treatment malpractice, foreign object cases, and fraudulent concealment have been presented to the Legislature and the courts of this State repeatedly (see, e.g., 1962 Report, supra, passim).
Lastly, but not least, principles of stare decisis are present. As recently as 1963, this court in a definitive discussion, in Schwartz v. Heyden Chem. Corp. (12 N Y 2d 212, remittitur amd. 12 N Y 2d 1073, cert. den. 374 U. S. 808), adhering to the rule in Conklin v. Draper (229 App. Div. 227, affd. 254 N.Y. 620), had this to say (pp. 218-219): "Considering the function of a Statute of Limitations as a device for repose, a potential defendant's equities are the same whether the plaintiff knows of his condition or not. Repose is as beneficial to society in the one case as in the other. While the plaintiff's equities are greater in one case, it was presumably pursuant to a determination that the interests of an occasional claimant were subordinate to society's interest in repose that resulted in the Statute of Limitations in the first place. The existence of a discovery provision in the fraud statute bespeaks a legislative judgment that only in fraud cases, by their very nature, were there a sufficient number of unknown wrongs to justify a departure from the general rule. Apparently the rarity of such unfortunate cases in other types of actions did not outweigh the disadvantages *441 of imposing a possible exception to the grant of repose to every person and industry who could be a potential defendant. It is hard to say for certain, but perhaps the possibility of feigned cases against unprepared defendants and the difficulties of proof in meritorious cases led to a decision that society is best served by complete repose after a certain number of years even at the sacrifice of a few unfortunate cases. Whatever the policy considerations, the recent amendment of the malpractice statute from two to three years (CPLR, § 214, subd. 6) makes it clear that the legislative choice was deliberately made in the face of strenuously advocated alternatives. (See 1942 Report of N. Y. Law Rev. Comm., pp. 141-143, recommending a discovery provision with an outside limit of six years. A similar recommendation was made in 1962. See N. Y. Legis. Doc., 1962, No. 65[C])."
Since the whole scheme of limitations of action is statutory, there is raised sharply the question of judicial encroachment upon the Legislature's lawmaking powers. Moreover, special difficulties for free judicial interpretation are raised by the explicit statutory provisions which deliberately interlock. The several limitation statutes covering general types of causes of action have always been treated together, whether in the Code of Procedure (Field Code, 1848), the Code of Civil Procedure (1877), the Civil Practice Act (1920), or, now, CPLR (1962). It is largely a consistent, meshing system, in a way that the several Statutes of Frauds have never been. Such a deliberate, self-conscious system does not lend itself, properly, to judicial gloss, so extensive as to be tantamount to substantial amendment.
Illustrative of the system's design are the limitation for fraud actions and the treatment of various related problems. In this State there has long been express provision for a discovery rule in actions based on actual fraud (CPLR 213, subd. 9; formerly CPLR 206, subd. [c]; Civ. Prac. Act, § 48, subd. 5; Code Civ. Pro., § 382, subd. 5; Code of Pro., § 91, subd. 6). And where other Statutes of Limitations are tolled by a discovery rule, it is by express statutory provision and not judicial interpretation (e.g., CPLR 206, subd. a, par. 1 [action against a fiduciary]; CPLR 213, subd. 7 [action to establish a lost will]; CPLR 214, subd. 7 [action to annul a marriage on the ground of fraud]; CPLR 213, subd. 5 [action by State for spoliation or *442 misappropriation of public property]; compare Domestic Relations Law, § 171, subd. 3 [action for divorce on ground of adultery denied if not commenced within five years after discovery], and Domestic Relations Law, § 200, subd. 4 [action for separation for adultery not allowed if not commenced within five years after discovery]). In fact, in 1965 the Judicial Conference recommended that former subdivision (c) of CPLR 206 be placed in CPLR 213 because the revisers intended that its discovery provision apply only to actions for actual fraud (1966 Report of N. Y. Judicial Conference, pp. 34-35; see 1965 Report of N. Y. Judicial Conference, pp. 96-106).
There are other problems. There has always been included in all of the legislative proposals for a discovery rule in malpractice actions an outside limit, and never one longer than five or six years. Such an outside limit is hardly capable of judicial establishment except by a gross arrogation of legislative power. Moreover, insofar as the present case is concerned, none of the 1942, 1964, or 1968 proposals, if any had been enacted, would have availed this plaintiff. Her action was brought just short of eight years after the commission of the malpractice, and, as noted, none of the proposals had an outside limit of more than six years. Nor would the contract cause of action she pleads be to any greater avail for that too is barred by the six-year statute (CPLR 213, subd. 2). It is hardly conceivable that if one of the discovery proposals had been enacted any court would presume to ignore an outside limit and permit the cause of action to lie.
Another problem that cannot be met properly by judicial innovation in this area is the possibility of classifying the different kinds of malpractice. Thus, there is strong argument for no outside limit or a very long one for foreign object claims, for reasons already suggested. A similar argument can be made for malpractice involving conjunctively fraudulent concealment. Such fraud has been treated in this State as not sufficient to base a separable cause of action subject to the fraud Statute of Limitations (Kleinman v. Lack, 6 A D 2d 1046). On the other hand, with respect to treatment malpractice, there is real concern over uncontrolled opening up of the limitations periods. Undoubtedly, for this reason, there has been such lagging in the Legislature and by others concerned with the *443 problem, in yielding to, what is now, a chorus of criticism of the short Statute of Limitations.
But criticism and dissatisfaction with legislative formulations and inaction are not enough, for, if hard cases make bad law, it is also true that a court's yielding to its own strongly felt sense of justice, without conscious and sufficient regard for the legislative process and product, can create bad jurisprudence.
The courts, for that matter, are not in harmony as to the just rule for accruing the right to a malpractice action and have gone in diverse directions. "Almost every case dealing with the question recognizes that there are valid but contrary interests supporting each view" (Yoshizaki v. Hilo Hosp., 433 P. 2d 220, 222 [Hawaii]).
Confronted with this vexing problem, the courts in jurisdictions with available reported cases have divided on whether a discovery rule should be applied. (See, generally, Ann., Statute of Limitations  Malpractice, 80 ALR 2d 368; 1962 Report, supra, p. 227 et seq., esp. pp. 255-263, 269-283; materials and cases cited in the majority opn., pp. 431-432.)
Courts which have considered the scope of judicial freedom in construing statutes providing for limitations provide an even greater diversity of analysis.
The Massachusetts Supreme Judicial Court rejected a discovery rule because the Legislature, the year before, having before it a two-year discovery rule with a five-year outer limit, merely extended the existing Statute of Limitations from two years to three years (Pasquale v. Chandler, 350 Mass. 450). On the other hand, in 1966, the Supreme Court of Oregon adopted the discovery rule for malpractice actions, overruling a 1964 holding, notwithstanding the failure of its Legislature in 1963 and 1965 to pass bills identical in content which would have provided a discovery rule qualified by an outside time limit (Berry v. Branner, 245 Ore. 367, overruling Vaughn v. Langmack, 236 Ore. 542). In both Massachusetts and Oregon the general statutes had already contained a discovery exception for classic fraud actions.
Many States provide by statute that the time for commencement of a fraud action is postponed until the plaintiff discovered the fraud or could have with reasonable diligence done so (e.g., CPLR 213, subd. 9). Interestingly, in some States the *444 coexistence of such a statute is held to indicate that the Legislature did not intend the malpractice Statute of Limitations to be tolled until discovery. That if it did so intend "it could have added a provision to that effect" (DeLong v. Campbell, 157 Ohio St. 22, 27; see, also, Lindquist v. Mullen, 45 Wn. 2d 675; Tantish v. Szendey, 158 Me. 228; Pasquale v. Chandler, supra). And, on the other hand, some courts have held that: "These are two distinct causes of action and their application is upon entirely different theories and proof", thus permitting a limited discovery rule in malpractice actions (Billings v. Sisters of Mercy of Idaho, 86 Idaho 485, 496; see, also, Christiansen v. Rees, 20 Utah 2d 199; Berry v. Branner, supra).
Other States have provisions which generally toll the running of a Statute of Limitations where there is fraudulent concealment of the cause of action. In these States, the courts of several require that there must be fraudulent concealment in order to toll the malpractice Statute of Limitations (Lewis v. Shaver, 236 N. C. 510; Saffold v. Scarborough, 91 Ga. App. 628; Crossett Health Center v. Croswell, 221 Ark. 874; Adams v. Ison, 249 S. W. 2d 791 [Ky.]; Hinkle v. Hargens, 76 S. D. 520; Guy v. Schuldt, 236 Ind. 101). In at least one State the courts find constructive concealment merely on the malpractitioner's failure to discover what he should have discovered (Acton v. Morrison, 62 Ariz. 139; Morrison v. Acton, 68 Ariz. 27). Others have held "Simply because the legislature has chosen to clarify or define when a cause of action accrues in those instances when fraudulent concealment causes a delay in the bringing of an action for injuries sustained, it does not necessarily follow that the legislature must therefore have pondered and rejected all other situations which might justify an exception to the statute of limitations for personal injury suits" (Wilkinson v. Harrison, 243 A. 2d 745, 749 [R. I.]; see, also, Johnson v. Caldwell, 371 Mich. 368; Waldman v. Rohrbaugh, 241 Md. 137; Billings v. Sisters of Mercy of Idaho, supra).
In three States, besides New York, known to have different and specific legislative discovery exceptions in their statutory scheme, the courts hold that the existence of the exceptions indicates a deliberate legislative concern not to extend such exceptions to malpractice cases (Mosby v. Michael Reese Hosp., 49 Ill. App. 2d 336 [discovery rule for radiological injury and *445 occupational diseases]; DeLong v. Campbell, supra [discovery rule for underground trespass or property injury to mines]; Carter v. Harlan Hosp. Assn., 265 Ky. 452 [underground trespass]; but, see 509 Sixth Ave. Corp. v. New York City Tr Auth., 15 N Y 2d 48 [underground trespass is a continuing trespass]).
It is evident then that the problem is a bedevilling one, and the courts throughout the nation have been equally bedevilled. No persuasive and pervasive rationale or pattern is revealed. Two things are clear, however. The first is that a proper resolution can be best accomplished by legislative action if a sound, principled, intellectually consistent and straightforward set of rules is to govern limitations in malpractice actions. The second is that a minimal decent regard for the reciprocal relations between the courts and the Legislature demands that in the field of lawmaking, in which both branches of government share, there be a discernible abstention from encroachment by the one upon the other.
Accordingly, I dissent and vote that the order be affirmed and the complaint stand dismissed.
Order reversed, with costs in all courts, and case remitted to Special Term for further proceedings in accordance with the opinion herein.
NOTES
[1] Davis v. Bonebrake, 135 Col. 506 (sponge); Layton v. Allen, 246 A. 2d 794 (Del.) (hemostat); Billings v. Sisters of Mercy of Idaho, 86 Idaho 485 (sponge); Spath v. Morrow, 174 Neb. 38 (needle); Fernandi v. Strully, 35 N. J. 434 (wing nut); Seitz v. Jones, 370 P. 2d 300 (Okla.) (needle); Gaddis v. Smith, 417 S. W. 2d 577 (Tex.) (sponge); Christiansen v. Rees, 20 Utah 2d 199 (needle); Morgan v. Grace Hosp., 149 W. Va. 783, supra (sponge).
[2] Stafford v. Schultz, 42 Cal. 2d 767; City of Miami v. Brooks, 70 So. 2d 306 (Fla.); Yoshizaki v. Hilo Hosp., 433 P. 2d 220 (Hawaii); Springer v. Aetna Cas. & Sur. Co., 169 So. 2d 171 (La.); Waldman v. Rohrbaugh, 241 Md. 137; Johnson v. Caldwell, 371 Mich. 368; Grey v. Silver Bow County, 149 Mont. 213; Iverson v. Lancaster, 158 N. W. 2d 507 (N. D.); Berry v. Branner, 245 Ore. 307; Ayers v. Morgan, 397 Pa. 282; Wilkson v. Harrington, 243 A. 2d 745 (R. I.); cf. Chrischilles v. Griswold, 150 N. W. 2d 94 (Iowa).
[3] Alabama Code, tit. 7, § 25, subd. (1); Connecticut Gen. Stat., § 52-584.
[4] Acton v. Morrison, 62 Ariz. 139; Crossett Health Center v. Croswell, 221 Ark. 874; Saffold v. Scarborough, 91 Ga. App. 628; Mosby v. Michael Reese Hosp., 49 Ill. App. 2d 336; Guy v. Schuldt, 236 Ind. 101; Ogg v. Robb, 181 Iowa 145; Waddell v. Woods, 160 Kan. 481; Carter v. Harlan Hosp. Assn., 265 Ky. 452; Tantish v. Szendey, 158 Me. 228; Pasquale v. Chandler, 350 Mass. 450; Wilder v. St. Joseph Hosp., 225 Miss. 42; Thatcher v. DeTar, 351 Mo. 603; see, also, Mo. Statutes, § 516.140 (malpractice action must be brought within two years after act); Cloutier v. Kasheta, 105 N. H. 262; Shearin v. Lloyd, 246 N. C. 363; DeLong v. Campbell, 157 Ohio St. 22; Hinkle v. Hargens, 76 S. D. 520; Bodne v. Austin, 156 Tenn. 366; Murray v. Allen, 103 Vt. 373; Hawks v. DeHart, 206 Va. 810; Lindquist v. Mullen, 45 Wn. 2d 675; Lotten v. O'Brien, 146 Wis. 258).
[5] "Prior to September 1, 1900, actions against physicians and surgeons based upon their negligence which resulted in bodily harm were subject to a three-year Statute of Limitations. In 1900 the Code of Civil Procedure, section 384 (1) was amended [L. 1900, ch. 117] by adding the word `malpractice' as an actionable case to the enumeration of actions to recover damages which had to be commenced within two years." (1942 Report of N. Y. Law Rev. Comm., p. 167.) In 1942 the Law Revision Commission recommended a limitation statute of one year after discovery with an outside limit of six years after the commission of the wrong (1942 Report of N. Y. Law Rev. Comm., pp. 141-143, 772). This bill was referred to the Codes Committee of the Senate and the Judiciary Committee in the Assembly. Neither committee reported on the bill to their respective houses.

In 1962 the Law Revision Commission recommended that medical malpractice actions accrue from the time of discovery, but in no event should an action be brought later than six years from the occurrence of the malpractice (1962 Report of N. Y. Law Rev. Comm., pp. 227-285). The Senate passed the bill. The Assembly's Codes Committee, however, never reported on the bill (1962 Report, supra, p. 727).
In 1968 a bill was again introduced. This bill provided that the action would accrue from the time of discovery but limited the bringing of the action to within five years from the occurrence of the malpractice. This bill passed the Assembly, but failed to be reported out of committee in the Senate (1968 N. Y. Leg. Record & Index, pp. A. 64 [A. Int. 689], S. 416 [S. Int. 4497]).
When the CPLR was proposed, the draftsmen changed the old two-year statute to a three-year period of limitations. However, for strategic reasons, the draftsmen did not recommend a discovery rule (CPLR 214, subd. 6; Civ. Prac. Act, § 50, subd. 1; 1 Weinstein-Korn-Miller, N. Y. Prac., par. 214.17 et seq., but esp. par. 214.21). (2d Report, N. Y. Legis. Doc. [1958], No. 13, p. 538.)
The Legislature, therefore, does not appear to be disinclined to enacting a statute embodying a discovery rule.
Bills embodying discovery rules have passed both Houses of the Legislature at different times. Neither House, when it has had the opportunity to deliberate and vote upon a bill, has ever failed to pass the measure.