In re HAWAII FEDERAL ASBESTOS CASES.

Esther IIDA, individually and as Legal Representative of the Estate of Kenji Iida, deceased, Plaintiffs,

v.

ALLIED SIGNAL, INC., etc., et al., Defendants.

No. 92–00706.

United States District Court, D. Hawai'i.

June 1, 1994.

**704**

Gary O. Galiher, L. Richard DeRobertis, and Derek S. Nakamura, Honolulu, HI, for plaintiffs.

Edward J. Bybee, Bybee, Chang & Rulon, Honolulu, HI, for Wagner Elec. Corp.

Jerold T. Matayoshi and Christine E. Kuriyama, Fukunaga, Matayoshi, Hershey & Kuriyama, Honolulu, HI, for Kelsey Hayes Co.

James C. McWhinnie, Damon, Key, Bocken, Leong & Kupchak, Honolulu, HI, for Abex Corp.

Jeffrey S. Portnoy, Cades, Schutte, Fleming & Wright, Honolulu, HI, for Allied Signal, Inc.

Helen H. Roesser, Honolulu, HI, for Borg–Warner Corp.

Charles Witherwax and Greg Nishioka, Honolulu, HI, for Chrysler Corp.

John R. Myrdal and Dianne G. Jagmin, Honolulu, HI, for General Motors Corp.

### ORDER RE: MOTION FOR SUMMARY JUDGMENT ON ISSUE OF STATUTE OF LIMITATIONS

CONTI, District Judge.

## I. INTRODUCTION

Plaintiff Esther Iida filed the present action on September 28, 1992, individually and as legal representative of the estate Kenji Iida, to recover damages arising out of Mr. Iida's illness and death. The complaint alleges that Mr. Iida died from pulmonary disease caused by his exposure to automotive products containing asbestos manufactured by Allied Signal and other defendants. Plaintiff asserts claims on behalf of the estate on a variety of products liability and warranty theories. Plaintiff also asserts a wrongful death claim in her individual capacity. The matter is presently before the court on defendants' motions for summary judgment on the issue of statute of limitations.[1]

## II. BACKGROUND

The following facts are not disputed.

Mr. Kenji Iida died from pulmonary interstitial fibrosis on January 7, 1991. The instant lawsuit was filed on September 28, 1992, one year and nine months later.

Mr. Iida worked as an automotive mechanic from 1944 until his retirement in 1984. During his employment as a mechanic, Mr. Iida worked with automotive brake and clutch products allegedly manufactured by defendants. These automotive products contained asbestos ("asbestos friction products"). Mr. Iida's exposure to asbestos friction products allegedly occurred between 1944 and 1980. Mr. Iida stated that although he had worked with friction products made by several manufacturers, he could only remember one brand name, "Raybestos."

According to Mr. Iida, symptoms of asbestosis emerged in October of 1984. He developed a chronic cough and suffered from fatigue which worsened progressively during the following years. Iida's doctors discovered a shadow on his lung on X-rays taken in 1984.

Mr. Iida's pulmonary problems intensified during 1985. Dr. James Lambeth, a radiologist, reported the presence of interstitial fibrosis in Iida's lungs as of December, 1985. Dr. Lambeth concluded that Iida suffered from mild pulmonary fibrosis.

Mr. and Mrs. Iida first learned of the general dangers associated with asbestos while watching a television news program during the late 1980's. However, plaintiffs maintain that they only became aware of the

---

1. Numerous manufacturing defendants have filed motions for summary judgment on the issue of statute of limitations. The motions raise identical issues and generally advance identical legal theories. The court will not address defendants' motions on an individual basis. The defendants are Allied Signal Inc., Wagner Electric Corporation, Borg–Warner Corporation, General Motors Corporation, Chrysler Corporation and Abex Corporation.

possible relationship between Iida's respiratory condition and his asbestos exposure during a consultation with Dr. Benjamin Ono in May of 1986.

Mr. Iida was hospitalized in 1986 for various tests, including a bronchoscopy and trans-bronchial lung biopsy. The results indicated non-specific chronic inflammation. During the spring and summer of 1986, Dr. James Williams took a series of X-rays of Mr. Iida's lungs which confirmed the presence of diffuse interstitial infiltrates or fibrosis.

In 1988, Dr. Ono referred Iida to Dr. David Andrew, a pulmonologist at Straub Clinic & Hospital for "evaluation of chronic cough, exertional dyspnea and pulmonary infiltrates on chest x-ray." Mr. Iida informed Dr. Andrew that he had been extensively exposed to asbestos fiber during his employment as a mechanic while realigning automotive brakes.

On June 6, 1988, Dr. Andrew concluded that Mr. Iida suffered from an asbestos related disease. Specifically, he returned a clinical diagnosis of "asbestosis"—a "slowly progressive diffuse interstitial fibrotic disease." Plaintiff admitted that she and her husband were informed by Dr. Ono that Iida suffered from Asbestosis in March or April of 1990. Dr. Ono maintains, however, that "no final or definite diagnosis of asbestosis was made by me or conveyed by me to Mr. Iida before Mr. Iida's death."

On August 21, 1990, Dr. Andrew re-evaluated Mr. Iida at the request of Dr. Ono. Dr. Andrew's clinical notes of the visit confirmed his previous diagnosis of asbestosis. Dr. Andrew notified Dr. Ono of his findings, including his diagnosis of "pulmonary asbestosis" by a letter dated August 21, 1990.

Mr. Iida was hospitalized from August 22 to August 23, 1990 at the Straub Clinic for tests to determine whether he suffered from spinal cord compression. The hospital records, including the nurses admission notes, the out-patient and short-stay records and electromyography report, contain numerous references to Mr. Iida's history of asbestosis. One entry specified that "pt [patient] has lung disease—asbestosis dx [diagnosed] two years ago."

Sometime before September 19, 1990, Dr. Ono informed Mr. Iida that his pulmonary disorder was work-related. Mr. Iida prepared a claim for workers' compensation benefits dated September 19, 1990, in which he recited that he suffered from asbestosis related to his employment as an automobile mechanic. Specifically, Mr. Iida listed the date of accident as "July, 1944," and described his condition as follows: "While working as a mechanic over the years, developed lung damage, asbestosis (symptoms surfaced about Oct., 1984)." Mr. Iida further indicated that he suffered from "asbestosis" in the area of the form designated for the claimant's description of work-related injury or illness.

In a physician's report filed in support of Mr. Iida's worker's compensation claim on October 25, 1990, Dr. Ono stated that the *only* cause of his patient's condition was "lung damage & Asbestosis" related to his work as an automobile mechanic. Dr. Ono's final diagnosis was "Interstitial Fibrosis, Cough."

III. *LEGAL STANDARD*

■ Summary judgment is proper only when there is no genuine issue of material fact and, when viewing the evidence in the light most favorable to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed.R.Civ.P. 56(c); *Jung v. FMC Corp.*, 755 F.2d 708, 710 (9th Cir.1985). Once a summary judgment motion is made and properly supported, the opposing party may not rest on the mere allegations of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Myrtle Nell Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine factual issue is an issue that may be reasonably drawn in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Moreover, if the factual context makes the opposing party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary

to establish a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ A court determining whether a plaintiff's action is time-barred must apply the substantive law of the forum state, including that state's applicable statutes of limitation. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 79–80, 58 S.Ct. 817, 822–823, 82 L.Ed. 1188 (1938); *Guaranty Trust Co. v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). Accordingly, Hawaii's statutes of limitation will control in the instant action.

## IV. *DISCUSSION*

Plaintiffs allege various causes of action against Allied Signal, General Motors and the other manufacturing defendants, including claims for products liability, negligence, breach of warranty and wrongful death. Defendants contend that they are entitled to summary judgment on each of plaintiffs' claims on grounds that they are barred by the applicable statutes of limitations. The court grants in part and denies in part defendants' motions for summary judgment.

### A. *Personal Injury Claims*

H.R.S. section 657–7 is the statute of limitations governing personal injury claims. This section provides that "actions for the recovery of compensation for damage or injury to persons or property shall be instituted within two years after the cause of action accrued . . ." *Au v. Au,* 63 Haw. 210, 216, 626 P.2d 173 (1981).

■ Under Hawaiian law, an action for personal injury or property damage does not accrue, and the applicable statute of limitations does not commence, until a plaintiff "could reasonably have been aware that she had a claim." *Yamaguchi v. Queen's Medical Center,* 65 Haw. 84, 90, 648 P.2d 689 (1982) (claim accrues upon discovery of injury, negligent act and causation). The Ninth Circuit has applied this standard to a Hawaii asbestos action brought by a naval shipyard worker. *Carvalho v. Johns–Manville Sales Corporation, et. al., (Carvalho II )* 871 F.2d 891 (9th Cir.1989). The *Carvalho II* court

held that a cause of action accrues within the meaning of H.R.S. section 657–7 when the plaintiff discovers, or in the exercise of reasonable diligence, should have discovered, that his lung disorder was caused by asbestos and that defendants' negligence may have caused the injury. *Id.,* at 894.

Moreover, a plaintiff's "knowledge of a claim involves knowledge that the defendant's negligence or violation of a duty may have caused the injury." *Id.,* at 894. Knowledge of a claim is not, however, synonymous with specific knowledge that a plaintiff has a legal cause of action. As explained in *Sahlie v. Johns–Manville Sales Corp.,* 99 Wash.2d 550, 663 P.2d 473 (1983) *cited with approval in Rose v. A.C. & S., Inc.,* 796 F.2d 294, 295–96 (9th Cir.1986),

> While in most cases knowledge, actual or imputed, of the essential elements of the action will probably amount to knowledge of the existence of the cause of action, this is not necessarily so. A plaintiff may well be aware of the facts comprising the essential elements of the action without being aware that he has a legal cause of action.

*See also Kensinger v. Abbott Laboratories,* 171 Cal.App.3d 376, 217 Cal.Rptr. 313 (1985),

> In the context of drug product liability cases, a plaintiff may be aware of an injury and its cause, while possessing no knowledge of *facts* indicating wrongdoing by a particular defendant. In such a situation, litigation may be premature for lack of knowledge of any *factual basis* for imputing fault to a manufacturer rather than ignorance of support of legal theories.

(emphasis added).

■ To summarize, a cause of action accrues when a plaintiff has actual or imputed knowledge of a factual basis for each of the elements comprising his claim. Accordingly, a negligence action accrues under section 657–7 and the statute of limitations commences, when a plaintiff has actual or imputed knowledge of: (1) his injury; (2) the defendant's negligence or breach of legal duty and (3) the causal connection between the two.

■ A different test applies to products liability actions. The statute of limitations

commences to run on a products liability action on the earliest date that a plaintiff knows, or in the exercise of reasonable diligence, should know of the following elements: (1) that the defendant is engaged in the business of manufacturing or selling the product; (2) that the product contains a defect dangerous to the user or consumer; and (3) that the defect is the cause of his injury. *Johnson v. Raybestos–Manhattan, Inc.,* 69 Haw. 287, 740 P.2d 548, 549 (1987). A product is dangerously defective if "it does not meet the reasonable expectations of the ordinary consumer or user as to its safety." *Id.; Ontai v. Straub Clinic and Hospital,* 66 Haw. 237, 241, 659 P.2d 734, 739 (1983).

■ Plaintiff's discovery of these elements may occur at different times and the party seeking to assert a statute of limitations defense has the burden of proving that plaintiff had knowledge of each element before a claim can be deemed to accrue. *Carvalho v. Raybestos–Manhattan,* (*Carvalho I* ) 794 F.2d 454 (9th Cir.1986). Here, plaintiffs assert claims against defendants under theories of both negligence and strict products liability. Although the issues are necessarily interrelated, each claim is examined separately below.

### 1. *Strict Products Liability Claims*

■ Uncontroverted evidence establishes that Kenji Iida knew that he suffered from an asbestos-related lung disorder caused by his many years of occupational exposure to asbestos friction products as of September 19, 1990—the date of his claim for worker's compensation benefits. Mr. Iida installed these products as new replacement parts in the vehicles he repaired in the course of his employment as an auto mechanic and there can be no serious dispute as to whether these asbestos products reached Mr. Iida in their ordinary and unaltered form.

Moreover, Mr. Iida testified that he worked with asbestos products made by several different manufacturers and specifically recalls working with parts manufactured by Raybestos. At the time of his death, Mr.

Iida could not recall or identify the names of the other manufacturers, nor is it clear that his estate possesses such knowledge even now. However, to the extent that Iida's product liability claims rest entirely on theories of market-share and enterprise liability, his knowledge or lack of knowledge concerning the identities of particular manufacturing defendants would appear to have no bearing on the viability of his claims or on the effect of a statute of limitations defense.[2]

The sole remaining issue is whether Mr. Iida knew or should have known that the asbestos-containing products which he certified to be the cause of his disabling lung disease were "dangerously defective." The court finds that an ordinary consumer who was informed that a product was dangerous and who knew that it caused his chronic cough, fatigue and shortness of breath, would consider that product unsafe beyond his reasonable expectations. Accordingly, Kenji Iida knew all that was necessary to trigger the statute of limitations on his strict liability claims on the date that he filed his worker's compensation claim, September 19, 1990. His claims were not filed within two years of that date and are accordingly time-barred under H.R.S. 657–7.

### 2. *Negligence*

■ As discussed above, the viability of plaintiff's negligence action involves a slightly different analysis. The evidence conclusively establishes that Iida was aware of two elements of negligence—injury and causation—as of September 19, 1990. His worker's compensation application furnishes uncontrovertible proof that he knew that he had asbestosis. This document, combined with the records of his medical examinations, further establishes that Iida understood his disease (and its symptoms) to be caused by his extensive occupational exposure to asbestos-containing brake and clutch products allegedly manufactured by defendants. Plaintiff contends, however, that Iida did not know as of September 28, 1990, that the asbestos

**2.** Since the identification of a particular manufacturing defendant is not an element of the plaintiff's case under theories of market share or enterprise liability, the last element of the *Carvalho* "accrual" test is not required before the statute of limitations begins to run.

manufacturers had breached a duty towards him.

■ Negligence is the failure to exercise ordinary care. A manufacturer's duty of ordinary care is a duty to warn consumers of dangers involved in the use of a product which are or should be known to the manufacturer, as well as a duty to use ordinary care in the design and manufacture of the products themselves. Defendants have introduced no evidence that Mr. Iida had actual or imputed knowledge of the manufacturer's awareness of the risks associated with asbestos during the period of his exposure. Nor have defendants shown that Mr. Iida had any reason to know that the manufacturers were negligent in designing or manufacturing their asbestos-containing products in light of prevailing industry standards and the state of the art during the period of his exposure. *Johnson*, 740 P.2d at 549 (state of the art evidence central to product liability actions premised on negligent design, manufacture or failure to warn) (Hawaiian law). Simply put, defendants have failed to show that Mr. Iida had actual or imputed knowledge of defendants' negligence or breach of duty. Accordingly, defendants' motions for summary judgment on the issue of statute of limitations are denied as to Iida's negligence action.

The court is well aware of the seeming absurdity of this result and notes that it is not compelled by a rule of its own making. *See Carvalho II*, 871 F.2d 891 (9th Cir.1989). A discovery rule which conditions accrual of an action on a plaintiff's specific knowledge of another's negligence means, in many cases, that an action will not accrue until a party walk's into a lawyer's office and is advised that he has an actionable claim. This should not be the law. A party must exercise reasonable diligence in pursuing a claim. If a plaintiff fails to exercise such diligence in a timely manner, the cause of action should be barred by the statute of limitations. When a party knows that he has been injured, knows that his injuries are caused by his exposure to a specific product, and knows or has reason to know the identities of the product manufacturers, that party should also know that he can charge those

manufacturers with wrongdoing. Higher courts may wish to reexamine the wisdom of a discovery rule that exalts fiction over reality and renders meaningless the statute of limitations for so broad a class of cases.

### B. *Breach of Warranty*

■ Plaintiff's claims for breach of express and implied warranties are governed by a four-year statute of limitations under H.R.S. § 490:2–725. *Holliday v. Bell Helicopters Textron, Inc.*, 747 F.Supp. 1396 (D.Haw.1990); *Schulz v. Honsador, Inc.*, 67 Haw. 433, 436, 690 P.2d 279 (1984). This section provides, in pertinent part, as follows:

(1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. . . .

(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

H.R.S. § 490:2–725.

UCC section 2–725 was enacted "[t]o introduce a *uniform* statute of limitations to sales contracts." Comments to Official Text of H.R.S. section 490:2–725. The Hawaii legislature believed that this statute would

Eliminate the jurisdictional variations and provide needed relief for concerns doing business on a nationwide scale whose contracts have heretofore been governed by its several different periods of limitation, depending upon the state in which the transaction occurred. This Article *takes sales contracts out of the general laws limiting the time for commencing contractual actions* and selects a four year period as the most appropriate to modern business practice.

*Id.* (emphasis added).

Defendants contend that the limitations period for plaintiff's warranty claims elapsed,

at the very latest, in 1984—four years after the last alleged date of Iida's exposure. The court agrees. Plaintiff alleges that Iida's exposure to defendant's asbestos-containing products continued until 1980. All of the offending products were necessarily tendered before the end of that year. The limitations period elapsed in 1984. Plaintiff filed this lawsuit eight years later in 1992. Accordingly, plaintiff's warranty claims are time-barred under the plain terms of the statute of limitations.

Plaintiff admonishes the court against such a straightforward ("too-literalistic" [sic]) application of the UCC which she dismisses as a "rote" and "wooden" exercise taking "little judicial effort." The court notes that it is not the first to indulge in such a construction. *See Rosenberg v. Celotex Corp.*, 767 F.2d 197 (5th Cir.1985) (breach of warranty claims for injuries caused by asbestos exposure accrue on date defective product sold); *Simmons v. Clemco Industries*, 368 So.2d 509 (Ala.1979) (four-year limitations period under UCC 2-725 for warranty claims related to asbestos exposure measured from tender of delivery and not date that injury is discovered); *see also Reyes v. Bertocchi*, 92 A.D.2d 863, 459 N.Y.S.2d 834 (1983) (warranty claim for injuries arising from use of IUD time-barred where not prosecuted within four years of date device prescribed by physician); *Neibarger v. Universal Cooperatives Inc.*, 181 Mich.App. 794, 450 N.W.2d 88 (1989).

Plaintiff further argues that the judicially created "discovery rule" announced in *Yoshizaki v. Hilo Hospital*, 50 Haw. 150, 433 P.2d 220 (1967), applies to breach of warranty claims pursuant to H.R.S. section 490:2-725(4). However, the *Yoshizaki* discovery rule applies by its own terms only to tort claims. Plaintiff has not cited any case authority extending the discovery rule to warranty claims.

Moreover, section 490:2-725(1) simply states that "[t]his section does not alter the law on tolling of the statute of limitations." Nothing in the legislative history or subsequent case law supports the proposition that this provision is intended to extend the scope of the "discovery rule" to include all breach of warranty claims involving personal injury.

Indeed, the only case on point belies that conclusion. *See Holliday*, 747 F.Supp. 1396 (implied warranty claim brought by passengers injured in helicopter crash was time-barred; statute of limitations commenced at time of first sale—13 years prior to crash—and date of injuries irrelevant).

■ Plaintiff further asserts that H.R.S. section 490:2-725 is unconstitutional unless the court finds that a claim does not accrue under this provision until a plaintiff could reasonably discover a breach. Plaintiff's constitutional argument appears to be grounded in the equal protection clause of Article I, Section 5 of the Hawaii Constitution. Plaintiff advances two theories of equal protection violation.

First she argues that the statute discriminates among two classes of warranty claimants, those whose product-related injuries can be readily discovered within four years of delivery and those whose injuries stem from industrial diseases with long latency periods. Second, she appears to argue that the UCC arbitrarily discriminates (to her detriment) among differing classes of defendants, insofar as it "grant[s] partial immunity to those in commercial sales" without similarly limiting the liability of others potentially liable for industrial diseases. Specifically, she contends that the statute works an anomalous result to the extent that immunizes manufacturers from warranty liability for industrial diseases without effecting the liability of employers under the worker's compensation statute, or the malpractice liability of physicians treating workers afflicted with industrial illnesses or injuries.

Plaintiff's first equal protection argument is not well-taken. Any distinctions the UCC implicitly draws between warranty claimants with latent injuries and warranty claimants whose injuries are readily discovered are clearly not based on any suspect classification. Accordingly, the state need only show that it has a legitimate interest for adopting the UCC provision at issue. The legislative history establishes that the legislature adopted the UCC to establish a uniform law of commercial sales contracts which would inject uniformity and predictability into sales contracts, thereby encouraging business op-

portunities within the state of Hawaii. This is a legitimate purpose.

Plaintiff's second equal protection argument is frivolous and merits little discussion. It suffices to observe that there is nothing remotely unfair, anomalous or even mildly surprising about a legislature's differing treatment of warranty remedies, worker's compensation remedies and medical malpractice liability.

■ Plaintiff further argues that the court should continue these summary judgment proceedings to allow further discovery on the issue of breach of express warranties. Plaintiff states that "certain defendants refused Plaintiffs' requests to identify and produce advertisements and others (e.g. General Motors) apparently produced some advertisements, yet plaintiffs cannot locate them from our storage files." Plf. Opp. Pg. 39.

If plaintiff was concerned about a defendant's failure to disclose advertisements, she should have brought a timely motion to compel. Moreover, this court will not delay its decision simply because plaintiff's counsel has misplaced potentially relevant evidence among his files. Finally, plaintiff's request for a continuance falls far short of both the procedural and substantive requirements Rule 56(f). *See Continental Maritime of San Francisco, Inc. v. Pacific Coast Metal Trades. Dist. Council,* 817 F.2d 1391, 1395 (9th Cir.1987).

Plaintiffs' claims for breach of implied warranties are time-barred by H.R.S. 490:2–725 and plaintiff has failed to produce any evidence of express warranties extending to the future performance of the products at issue. Accordingly, defendants' motions for summary judgment on plaintiff's claims for breach of implied and express warranties are granted.

## C. *WRONGFUL DEATH ACTION*

■ Mrs. Iida brings a wrongful death action on her own behalf under H.R.S. section 663–3 in addition to the claims asserted on behalf of her husband's estate. Defendants argue that plaintiff's wrongful death action is derivative of the claims of the estate and is therefore barred by the applicable statutes of limitation. Plaintiff argues that a statutory wrongful death action is an independent cause of action governed by a separate two-year statute of limitations.

H.R.S. section 663–3, Hawaii's wrongful death statute provides as follows:

*Death by Wrongful Act.* When the death of a person is caused by the wrongful act, neglect, or default of any person, the decedent's legal representative, or any of the persons hereinafter enumerated, may maintain an action against the person causing the death or against the person responsible for the death. The action shall be maintained on behalf of the persons hereinafter enumerated.... *Any action brought under this section shall be commenced within two years from the date of the death of the injured person, except as otherwise provided.*

The statutory wrongful death action is in the nature of a common law claim for loss of consortium. This section provides that a decedent's heirs may recover damages for loss of "love and affection, including (1) loss of society, companionship, comfort, consortium or protection, (2) loss of marital care, attention, advice, or counsel ..." H.R.S. section 663–3. The degree to which the viability of a wrongful death claim depends on the timeliness of the decedent's claim has not been squarely determined by the courts of Hawaii. This is an issue of considerable controversy among other jurisdictions.

Some courts hold that recovery for loss of consortium will be defeated or impaired by defenses that would bar or diminish the decedent's claim. *See generally* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser & Keeton on Torts* section 125 at 937 (5th ed. 1984). According to this view, if a decedent's claim is barred by the applicable statute of limitations, the surviving spouse's claim for loss of consortium is likewise barred. W. Keeton section 125; *Cathcart v. Keene Indus. Insulation,* 324 Pa.Super. 123, 471 A.2d 493 (1984); *Hunter v. School Dist.,* 97 Wis.2d 435, 293 N.W.2d 515 (1980). The courts which reach this result generally do so because of their view that the loss of consortium claim depends upon, or is derivative of, the injured spouse's personal injury claim.

See e.g. *Barker v. Scott*, 81 Misc.2d 414, 365 N.Y.S.2d 756 (1975); ("Thus, as the existence and survival of the derivative action must be determined by reference to the source action, so the procedural status of the derivative action must be tested by that of the source action").

Other courts recognize that a wrongful death action or claim for loss of consortium are derivative of the decedent's underlying claim, but derivative only in the sense that they necessarily derive from the decedent's injury.[3] As the Supreme Court of Washington explained,

> A derivative action is generally one that owes its existence to a preceding cause of action and is often, as in a shareholder's derivative suit, no more than a separate right to enforce the preceding claim. While the loss of consortium action is dependent on the occurrence of an injury to another, the claimant suffers an original injury that is the subject of the action. Thus the injury rather than the claim is derivative. For this reason ... the rights of the deprived spouse should not be restricted by or contingent on the rights of the impaired spouse.

*Reichelt v. Johns–Manville Corp.*, 107 Wash.2d 761, 733 P.2d 530, 536 (1987). On facts similar to those presented by the case at bar, the *Reichelt* court concluded that

> Since Lois Reichelt's claim for loss of consortium is a separate cause of action in Washington, it logically follows that the statute of limitations governing her claim should begin to run when *she* experienced *her* injury, not when her husband knew of his injury. Based on the foregoing, we conclude that a deprived spouse's loss of consortium claim is not necessarily determined by the timeliness of the impaired spouse's claim.

*Id.* 733 P.2d at 538 (emphasis in original).

Defendants' argument that the wrongful death action asserted by Mrs. Iida is a derivative action relies heavily on *Bertelmann v. Taas Associates*, 69 Haw. 95, 103, 735 P.2d

930 (1987). In *Bertelmann,* the Supreme Court of Hawaii acknowledged that

> The majority rule is that a plaintiff in a wrongful death action can only recover if the tortious harm the decedent suffered would have entitled the decedent to maintain an action against defendant ... That is, if the decedent's recovery was barred, so are his or survivors' wrongful death action.

*Id.* at 103, 735 P.2d 930. Applying this principle, the *Bertelmann* court concluded that [t]he Survivors' loss of love and affection under H.R.S. section 663–3 are derivative. As such, since Decedent had no cause of action against Sheraton Hotel, the Survivors cannot pursue their wrongful death action. Accordingly, no wrongful death action accrued.

*Id.* (citations omitted). However, the decedent's claim in *Bertelmann* involved a claim brought under Hawaii's dram shop statute, by the estate of an intoxicated man killed in a drunk driving accident against the defendant liquor sellers. The court concluded that the dram shop act was intended to safeguard the general public from drunk driving accidents and did not create a right of action in favor of intoxicated liquor consumers against the persons or establishments that served them alcohol. Specifically, the court held that in the absence of harm to an innocent third party, merely serving liquor to an already intoxicated customer and allowing the customer to leave the premises does not constitute actionable negligence. *Id.* Accordingly, the wrongful death action was barred to the extent that it was derivative of the decedent's injury, which did not give rise to an actionable claim.

Similarly, in *Towse v. State of Hawaii*, the Hawaii Supreme Court held that where an initial claim cannot be maintained, the derivative action of loss of consortium must also fail. 64 Haw. 624, 637, 647 P.2d 696 (1982). The defendants in *Towse* were immune from suit under the doctrine of qualified governmental immunity. As in *Bertelmann,* the underlying injury was not actionable and so

---

**3.** *See generally* Note, *Loss of Consortium: A Derivative Injury Giving Rise to a Separate Cause of* *Action,* 50 Fordham L.Rev. 1344, 1352 (1982).

the derivative claim failed to accrue. *Id.* *Bertelmann* and *Towse* therefore stand for little more than the proposition that an action for loss of consortium cannot create derivative liability where liability never existed in the underlying claim.

Other Hawaii cases have clarified the relationship between a principal claim for personal injury and a derivative claim for loss of consortium. For example, in *Doi v. Hawaiian Ins. & Guar. Co., Ltd.*, the court stated that

> Although the modern trend of tort law is to consider loss of consortium as an injury to the deprived spouse giving rise to a separate and independent action for damages, nevertheless it remains a derivative claim dependent for its viability upon the personal injury to one's spouse.

6 Haw.App. 456, 727 P.2d 884, 891 (1986); *see also Yamamoto v. Premier Ins. Co.*, 4 Haw.App. 429, 668 P.2d 42 (1983).

■ The foregoing authorities demonstrate that a spouse's wrongful death action is derivative of the decedent's injury and dependent for its viability upon the nature of the harm suffered by the decedent. If the harm suffered by the decedent was not actionable, because the tortfeasor was immune from suit, or because the tortfeasor owed no duty to the decedent, then the wrongful death action for damages derived from that harm must necessarily fail.

■ However, the wrongful death action is a separate and independent action in the sense that it seeks different, if derivative damages, accrues at the time of death rather than the time of injury, and is subject to a different statute of limitations. Assuming that the underlying injury or harm was actionable at the time it was sustained by the decedent, the derivative wrongful death action is entitled to go forward subject to the separate procedures and defenses specifically denominated in the wrongful death statute.

As in *Reichelt*, it logically follows that the statute of limitations governing Mrs. Iida's claim should begin to run when *she* experienced *her* injury, not when her husband knew of his injury. This conclusion is supported by two principles of construction an-

nounced by the Hawaii Supreme Court in *Crawford v. Crawford:* "First, courts will apply the longer limitations when there is doubt as to which statute applies. Second, whenever possible, the court should apply the state limitations period governing actions founded on a liability created by statute." 69 Haw. 410, 415, 745 P.2d 285 (1987) (citations omitted). Here, application of H.R.S. section 663-3 yields the longer limitations period in this case, and the two-year limitations period designated in this section specifically applies to actions brought under the wrongful death action.

Mrs. Iida's wrongful death action was brought well within two years of her husband's death and is accordingly entitled to go forward. Defendants' motions for summary judgment as to the wrongful death action are denied.

## V. CONCLUSION

In accordance with the foregoing, it is HEREBY ORDERED that:

1. Defendants' motions for summary judgment on the issue of statute of limitations as to the decedent's claims for strict products liability are GRANTED; Count Two of the complaint is DISMISSED WITH PREJUDICE;

2. Defendants' motions for summary judgment on the issue of statute of limitations as to decedent's claims for breach of express and implied warranties are GRANTED; Count Three of the Complaint is DISMISSED WITH PREJUDICE.

3. Defendants' motions for summary judgment on the issue of statute of limitations as to plaintiff's wrongful death action and decedent's negligence claims are DENIED.

IT IS SO ORDERED.