## HATSUMI YOSHIZAKI *v.* HILO HOSPITAL, BY ITS MANAGING COMMITTEE.

### No. 4511.

November 3, 1967.

RICHARDSON, C.J., MIZUHA, MARUMOTO, ABE AND LEVINSON, JJ.

OPINION OF THE COURT BY LEVINSON, J.

In the original decision in this case, 50 Haw. 1, 427 P.2d 845 (1967), this court affirmed the trial court's grant of summary judgment to the defendant. We granted rehearing solely on the issue whether the plaintiff's claim was barred by the statute of limitation, 50 Haw. 40, 429 P.2d 829 (1967), and now we reverse the trial court.

The only count of the plaintiff's complaint with which we are presently concerned alleges that between June 27 and July 5, 1959 the defendant hospital, through one of its doctors, negligently diagnosed the plaintiff's neck ailment as cancer. The doctor recommended radiation treatment for the "cancer." The plaintiff was treated at another hospital where, as a result of negligence by an employee of the other hospital, the plaintiff received radiation burns. The plaintiff received her last radiation treatment on August 21, 1959. Thereafter, she underwent several operations to correct the damage from the radiation treatments.

On September 17, 1963, the plaintiff filed her complaint alleging the improper diagnosis as negligence and alleging that she did not discover the diagnosis was incorrect until September 19, 1961. The trial court's order granting summary judgment is unclear as to when it concluded the statute began to run. Apparently it applied the rule that the cause of action accrued, and therefore the statute began to run, "at the time of the injury."

This case involves a narrow and precise question. When does the statute of limitation begin to run against a malpractice claim where the plaintiff did not know, nor acting reasonably could have been expected to know, that the defendant had negligently diagnosed an ailment?

To answer this question, we must construe the statute limiting the time for commencing an action for damages to persons or property.

> Actions for the recovery of compensation for damages or injury to persons or property shall be instituted within two years after the cause of action *accrued*, and not after. R.L.H. 1955, § 241-7 (emphasis added).

Clearly, the determining word in the statute is "accrued." Most state statutes of limitation use this term, whether the statute is generally applicable to all tort actions, *e.g.,* Fla. Stat. Ann. § 95.11 (1960) (our statute falls into this category), or is applicable only to malpractice actions, *e.g.,* Me. Rev. Stat. Ann., ch. 112, § 93 (1954). Courts in other states have construed "accrued" in widely divergent ways. One group of cases, and the construction which was regarded for many years as the "majority rule," interprets it to mean the time when the negligent act occurs, *e.g., Tantish v. Szendey,* 158 Me. 228, 182 A.2d 660 (1962). A second group construes it to mean when the first injury from the negligent act appeared, *e.g., Silvertooth v. Shallenberger,* 49 Ga. App. 133, 174 S.E. 365 (1934). A third group construes it to mean the time when the plaintiff discovered, or acting reasonably should have discovered the negligence, *e.g., Quinton v. United States,* 304 F.2d 234 (5th Cir. 1962) (interpreting a federal statute of limitation); *Johnson v. St. Patrick's Hospital,* _____ Mont. _____, 417 P.2d 469 (1966) (interpreting a state statute

of limitation). Almost every case dealing with the question recognizes that there are valid but contrary interests supporting each view, *e.g., Spath* v. *Morrow,* 174 Neb. 38, 115 N.W.2d 581 (1962). A few courts treat the issue as one solved by recourse to "clear" legislative mandate, *De Long* v. *Campbell,* 157 Ohio St. 22, 104 N.E.2d 177 (1952) (interpreted "accrue" to mean when negligent act occurred); *Lindquist* v. *Mullen,* 45 Wash. 2d 675, 277 P.2d 724 (1954) (recognized that cause of action could not accrue until some injury was sustained).

The harsh nature of the stricter constructions forced courts to evolve exceptions and to create legal fictions. A few courts have permitted a plaintiff to sue for breach of contract and thus avail himself of a usually longer statute of limitation, *e.g., Sellers* v. *Noah,* 209 Ala. 103, 95 So. 167 (1923). Other courts have construed the negligence to be the doctor's continual failure to discover and remove the injurious object left inside the patient and therefore the "continuing negligence" does not start the statute in operation until some point after the operation, *e.g., Hotelling* v. *Walther,* 169 Ore. 559, 130 P.2d 944 (1942) (failure to extract remnant of broken tooth). These courts deem the statute to begin running when the physician-patient relationship terminates, *Couillard* v. *Charles T. Miller Hosp., Inc.,* 253 Minn. 418, 92 N.W.2d 96 (1958). Still other courts hold that the statute does not begin to run until discovery where the defendant has fraudulently concealed the negligent act, *Lakeman* v. *La France,* 102 N.H. 300, 156 A.2d 123 (1959). In carrying this approach to an extreme, some courts have in effect adopted the discovery rule by finding constructive fraudulent concealment in failure to inform the plaintiff of the negligence where the *defendant* knew, or *should have known* of the negligence, *e.g., Seitz* v. *Jones,* 370 P.2d 300 (Okla. 1961). Finally, at least one court has refused to permit the statute to bar an action on the grounds that

> Justice cries out that she [plaintiff] fairly be afforded a day in court * * * . *Fernandi* v. *Strully,* 35 N.J. 434, 451, 173 A.2d 277, 286 (1961).

Such cases cannot help but make the law appear to be an "Alice in Wonderland" construction to be wielded by an arbitrary, al-

though in some cases benign, Queen of Spades wearing the judicial robe.

We do not think that the court in its first decision of this case gave adequate consideration to the nature of the judicial process, whether in construing a statute or in interpreting the common law.[1] Frequently a court is faced with two or more solutions to the problem before it, each of which has a valid claim to legitimacy. The court cannot avoid the function of choosing one of the alternatives merely by referring to the legislative will or to the binding nature of judicial precedent. The consequences of avoiding this selecting function can only lead to the distortion of the law.

> Often a spurious consistency is preserved by artificial and unreal distinctions. The idol is discredited, but he is honored with lip service, the rubrics of the ancient ritual. Cardozo, *The Growth of the Law* 18 (1924).

Obviously a court is not as free in construing statutes as in applying the common law to reach decisions dictated, in part, by its assessment of the ultimate values justifying the development of the law along certain lines.[2] Nor is it as free in deciding cases in the area of real property as in the area of torts.[3] We are aware of the many canons of construction which are supposed to aid a court in construing a statute. But we are also aware that for every construction exhorting a court to a literal interpretation of a statute there is a contrary one which justifies construction in a more liberal manner.[4] A statute must be interpreted with a view to the problems with which it is intended to deal and not by reference to the too often vague concept of legislative intent.[5]

---

[1] As Professor Keeton points out in his article, *Judicial Law Reform—A Perspective on the Performance of Appellate Courts,* 45 Tex. L. Rev. 1254, 1259 (1966), the idea that an appellate court has a creative role is not new.

[2] Cardozo, *The Growth of the Law* 94-95 (1924).

[3] Peck, *The Role of the Courts and Legislatures in the Reform of Tort Law,* 48 Minn. L. Rev. 265, 268 (1963).

[4] See Llewellyn, *The Common Law Tradition, Deciding Appeals* 522-35 (1960) for a substantial list of contradictory canons of construction.

[5] More often than not, what passes for "legislative intent" is no more than the ideas of a few individual legislators. Statements by legislators or even committee reports need not reflect the purpose which a majority of the legislators believe is carried out by the statute.

The basic policy underlying statutes of limitation is to require prompt assertion of claims.

> They [statutes of limitation] are founded upon the general experience of mankind that claims, which are valid, are not usually allowed to remain neglected. The lapse of years without any attempt to enforce a demand creates, therefore, a presumption against its original validity, or that it has ceased to subsist. This presumption is made by these statutes a positive bar; and they thus become statutes of repose, protecting parties from the prosecution of stale claims, when, by loss of evidence from death of some witnesses, and the imperfect recollection of others, or the destruction of documents, it might be impossible to establish the truth. *Riddlesbarger* v. *Hartford Ins. Co.*, 74 U.S. (7 Wall.) 386, 390 (1868).

But by the same token, the plaintiff in this case asserts another important policy, that favoring adjudication of claims on the merits and ensuring that a party with a valid claim will be given an opportunity to present it.

Our task would be easy if the legislature clearly had indicated which of these two policies should be considered paramount when they conflict.

We conclude that the statute does not begin to run until the plaintiff knew or should have known of the defendant's negligence. This conclusion is consistent with the legislative prescription to avoid constructions which would lead to absurd results.[6] The injustice of barring the plaintiff's action before she could reasonably have been aware that she had a claim is patent. A basic reason underlying statutes of limitation is nonexistent; the plaintiff has not delayed voluntarily in asserting her claim. We realize that added burdens are placed on defendants by forcing them to defend claims with evidence that may be stale. We should not overlook the fact that the plaintiff must produce evidence sufficient to establish a prima facie case before the defendant is obliged to produce any evidence. A few courts ap-

---

[6] R.L.H. 1955, § 1-18 (c) reads: "Every construction which leads to an absurdity shall be rejected."

pear to have limited the discovery doctrine to cases in which the defendant has left a foreign object inside the plaintiff in order to reduce the possibility that the plaintiff is asserting a completely fraudulent claim, *Billings* v. *Sisters of Mercy of Idaho,* 86 Idaho 485, 496-97, 389 P.2d 224, 232 (1964); *contra, Owens* v. *White,* 342 F.2d 817 (9th Cir. 1965). We reject the distinction. In some cases, especially those involving an allegedly negligent diagnosis, a physical object is not involved and proof becomes more difficult. This does not necessarily mean that a fraudulent claim may be more easily asserted. As in the instant case, treatment generally follows diagnosis. The treatment is an objective fact which may be proved or disproved by people other than the plaintiff. The fact that the treatment is the kind normally administered for the ailment the doctor allegedly improperly diagnosed is strong evidence of the diagnosis.

We conclude that the conflicting policies are best reconciled by permitting the plaintiff the opportunity to prove that she neither knew nor could reasonably have been expected to know of the defendant's alleged negligence until the date alleged in her complaint. If the legislature deems our reconciliation of these conflicting policies incorrect or wishes to place an outside limit on the time for bringing a malpractice action, it is free to do so.[7] Until that time, however, we will not deny a plaintiff access to our courts for failure to assert such a claim if he asserts it within two years after he actually or constructively discovered it.

Reversed and remanded to the trial court.

*George S. Yuda* (*Ushijima, Nakamoto* and *Yuda* of counsel) for plaintiff-appellant.

Alexander C. Marrack (*Robertson, Castle & Anthony* of counsel) for defendant-appellee.

---

[7]Courts too often overestimate the facility with which the legislative process can deal with reform in the area of tort law, *see* Peck, *supra* note 3 at 268-85. Where reform is necessary in the area of tort law, the court should act wherever possible and leave to the legislature the question whether the reform should be modified or rescinded in whole or in part. Judicial action is frequently necessary to overcome legislative inertia, Keeton, *supra,* note 1, at 1263.