971 P.2d 717

**Gordon Gaylord BUCK, individually and as Guardian of the Property of Leslie O'Toole–Buck, an incompetent person, Plaintiff–Appellant,**

v.

**Alexander Scott K. MILES, M.D.; A. Scott K. Miles, Inc.; a Hawaii corporation; John Does 1–10; Jane Does 1–10; Doe Corporations 1–10; Doe Partnerships 1–10; Doe Trusts 1–10; Doe "Non–Profit" Organizations 1–10; and Roe Governmental Agencies 1–10, Defendants–Appellees.**

No. 20368.

Supreme Court of Hawai'i.

Jan. 25, 1999.

Ian L. Mattoch and Daniel P. Kirley, Honolulu, on the briefs, for plaintiff-appellant.

Jeffrey S. Portnoy, Honolulu (Roy A. Vitousek, .III, Kailia Kona, Alexander W. Woody of Cades, Schutte, Fleming & Wright with him on the brief) Honolulu, for defendants-appellees.

MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

KLEIN, J.

Plaintiff-appellant Gordon Gaylord Buck, individually and as Guardian of the Property of Leslie O'Toole–Buck, appeals from the circuit court's order granting defendants-appellees Alexander Scott K. Miles, M.D. and A. Scott Miles, Inc.'s renewed motion for summary judgment. On appeal, Buck contends that the circuit court erred in granting Dr. Miles's renewed motion for summary judgment because (1) the statute of limitations period under Hawai'i Revised Statutes (HRS) § 657–7.3 (1985)[1] was not triggered until Buck was able to secure an expert opinion as to (a) Dr. Miles's violation of a

---

1. HRS § 657–7.3 provides in relevant part:
No action for injury or death against a ... physician ... duly licensed or registered under the laws of the ·State ... based upon such person's alleged professional negligence, shall be brought more than two years after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury[.]

legal duty, and (b) the causal connection between Dr. Miles's violation and the damages; or, (2) in the alternative, the limitation period under HRS § 657–7.3 was tolled due to O'Toole–Buck's mental incompetency under HRS § 657–13(2) (1985).[2]

We hold that O'Toole–Buck's cause of action accrued in October 1988 when she possessed knowledge of the facts necessary for an actionable claim. We also hold, however, that a genuine issue of material fact exists as to whether O'Toole–Buck was mentally incompetent at the time her cause of action accrued, thereby raising the issue of the applicability of the tolling provision under HRS § 657–13(2). Accordingly, we vacate the circuit court's order granting Dr. Miles's renewed motion for summary judgment and remand the case for further proceedings consistent with this opinion.

## I. BACKGROUND

In March 1988, O'Toole–Buck underwent heart surgery at Straub Hospital and Clinic to replace a mitral valve with a mechanical prosthesis. Coumadin, an anticoagulant medication that decreases the formation of blood clots, was prescribed for O'Toole–Buck as a prophylaxis to prevent clotting. Between April and September 1988, Dr. Miles treated O'Toole–Buck as a patient. During this period, he monitored and adjusted her coumadin levels. On September 18, 1988, O'Toole–Buck suffered a stroke and was hospitalized.

On October 3, 1988, O'Toole–Buck informed Christopher Linden, M.D., a physician at the Ka'u emergency room, that she suffered the stroke because Dr. Miles prescribed her an inadequate dose of coumadin and failed to properly monitor her coumadin levels. She later testified at her deposition that by October 3, 1988, she believed that she "had a stroke because [Dr. Miles] did not monitor the coumadin when he had decreased the dosage." O'Toole–Buck ultimately notified Dr. Miles's staff on October

5, 1988, that she no longer wanted Dr. Miles as her treating physician.

During the month following her stroke, O'Toole–Buck contacted the Law Offices of Ian L. Mattoch to inquire about bringing a claim against Dr. Miles. At her deposition, she testified that, at the time she contacted Mattoch, she believed that there was a claim against Dr. Miles.

Between November 1988 and February 1989, Mattoch obtained medical records relevant to O'Toole–Buck's case. He forwarded them to three health professionals, Sandra Ritz, R.N., Richard Littenberg, M.D., and Neal Benowitz, M.D. All three identified the causal connection between O'Toole–Buck's low coumadin levels and her September 18, 1988 stroke. They also opined, however, that a breach of a duty of care would be difficult to prove.

Prior to August 4, 1989, O'Toole–Buck sent a letter to Mattoch, criticizing nurse Ritz's conclusions about the likelihood of a successful negligence claim. In the letter, O'Toole–Buck stated that

> Dr. Miles was negligent when he lowered my coumadin level. In my medical records please note that Dr. Matsuura gave me a much different prescription[.] My Dr. Lyndon (that is not a cardiologist) has managed to keep my level at a reasonable rate all this time[.] So I can't understand why Dr. Miles couldn't do it. He never could even remember my name or, why I was there[.] He was a negligent Dr. from the start, and never got better[.] If you should decide not to take this case, please send my records to me and a release. As I am determined to prove his negligence and mal-practice.

(Brackets added.) (Ellipses omitted.)

Thereafter, O'Toole–Buck underwent a series of examinations by three mental health professionals. James Tom Greene, Ph.D, a clinical psychologist, examined O'Toole–Buck on January 28, 1991 on behalf of the Social Security Disability Determination Branch.

---

2. HRS § 657–13 provides in relevant part:
 If any person entitled to bring any action specified in this part ... is, at the time the cause of action accrued, ... [i]nsane; ... such person shall be at liberty to bring such actions within the respective times limited in this part, after the disability is removed or at any time while the disability exists.

He concluded that O'Toole–Buck was "mentally incompetent to manage her affairs subsequent to the September 18, 1988 cerebrovascular accident." Her mental incapacity, according to Dr. Greene, lasted through at least May 8, 1995, the date of his last examination.

On October 15, 1991, Shepard Ginandes, M.D., a psychiatrist, examined O'Toole–Buck and determined that she was not competent to "negotiate or manage her business or legal affairs" since her stroke on September 18, 1988 through at least October 15, 1991, the date of his last examination. He further recommended that a legal guardian be appointed for O'Toole–Buck. On December 4, 1991, the Third Circuit Court appointed Gordon Buck as O'Toole–Buck's Guardian of the Property.

Robert Sbordone, Ph.D, a neuropsychologist, examined O'Toole–Buck on November 14, 1995. He concluded that O'Toole–Buck was mentally incompetent to manage her legal or business affairs from the time of her stroke in September 1988 through at least the time of his examination.

On December 17, 1991, Buck filed a medical malpractice claim against Dr. Miles with the Medical Claims Conciliation Panel (MCCP). The panel held a hearing on May 29, 1992 and rendered its decision in favor of O'Toole–Buck on June 19, 1992. On August 19, 1992, Buck filed this action in the Third Circuit Court.

On June 26, 1995, Dr. Miles filed a renewed motion for summary judgment, arguing that the suit had not been filed within the two-year statute of limitations period set forth in HRS § 657–7.3. Buck opposed the renewed motion for summary judgment, arguing that, under HRS § 657–7.3, and consistent with Hawai'i Rules of Civil Procedure (HRCP) Rule 11, an expert opinion is required before the statute of limitations period under HRS § 657–7.3 begins to run. Buck maintained that O'Toole–Buck had only subjective knowledge of a possible malpractice claim, which is insufficient to trigger the commencement of the statute of limitations. Buck further claimed that the limitation period under HRS § 657–7.3 was tolled due to

O'Toole–Buck's mental incapacity, pursuant to HRS § 657–13(2).

A hearing on the motion was held on August 14, 1996, following which the circuit court granted Dr. Miles's motion for summary judgment. On September 16, 1996, the circuit court filed its findings of fact, conclusions of law, and order granting the defendant's renewed motion for summary judgment, which read, in pertinent part, as follows:

### CONCLUSIONS OF LAW

. . .

23. Plaintiffs argued that the statute of limitations does not begin to run in a medical malpractice action if, although exercising reasonable diligence, they are unable to obtain an expert opinion stating that the standard of care has been breached. In support of this argument, Plaintiffs claimed that Rule 11 of the Hawai'i Rules of Civil Procedure prevented them from filing a lawsuit prior to obtaining an expert opinion stating that the standard of care had been breached. While the court recognizes that Rule 11 may create a paradox in some circumstances, it is clear from the language of the statute and from the Hawai'i Supreme Court's language in *Yamaguchi* that the statute of limitations is triggered by plaintiff's knowledge, not by [her] counsel's investigation. Moreover, any paradox is mitigated by the fact that Plaintiffs could have filed a claim with MCCP without being subjected to the requirements of Rule 11. Indeed, the MCCP panels "undoubtedly were established 'to encourage early settlement of claims and to weed out unmeritorious claims.'" *Tobosa v. Owens*, 69 Haw. 305, 312, 741 P.2d 1280, 1285 (1987) (quoting HSCR No. 417, in 1976 House Journal, at 1460).

24. Plaintiffs argued that the statute of limitations was tolled pursuant to HRS § 657–13 because Ms. O'Toole–Buck was insane. However, the claim that Ms. O'Toole–Buck was insane is an after the fact attempt to avoid the time bar under HRS § 657–[1]3. The undisputed activities of Ms. O'Toole–Buck amply demonstrate that she was capable of under-

standing that she had a claim against Defendants and capable of pursuing the claim. Moreover, Mr. Mattoch's failure to file the MCCP claim until December 17, 1991 had nothing to do with Ms. O'Toole–Buck being "insane," but rather, as Mr. Mattoch testified at his deposition, was the result of Mr. Mattoch's belief that he could not file a claim until he received a favorable expert opinion on the issue of breach of the standard of care and that the statute of limitations would not commence running until he obtained such opinion.

25. Ms. O'Toole–Buck was competent to pursue her claim and, therefore, the statute of limitations was not tolled under HRS § 657–13.

. . .

27. The statute of limitations began to run against the claim brought on Ms. O'Toole–Buck's behalf on October 5, 1988 and expired on October 5, 1990—more than one year prior to the Plaintiffs' filing of its complaint with the MCCP. By this date, Ms. O'Toole–Buck had the requisite knowledge under the standard stated in *Yamaguchi* to trigger the accrual of her cause of action. This is clearly evidenced by: (i) Ms. O'Toole–Buck's statement to Dr. Linden on October 3 that she had a stroke because Dr. Miles failed to monitor her Coumadin level when he decreased the dose; (ii) her testimony at her deposition that, by October 3, 1988, she believed she "had a stroke because [Dr. Miles] did not monitor the Coumadin when he had decreased the dosage"; and (iii) her discharge of Dr. Miles on October 5, 1988. Accordingly, the claim brought on her behalf is barred.

On December 16, 1996, the circuit court entered its final judgment in favor of defendants and against O'Toole–Buck as to all claims. Buck timely filed this appeal.

## II. *STANDARD OF REVIEW*

This court applies the following standard of review to summary judgment orders:

> We review a circuit court's award of summary judgment *de novo* under the same standard applied by the circuit court. *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 104, 839 P.2d 10, 22, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992) (citation omitted). As we have often articulated:
>
> > Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is not genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.
>
> *Id.* (citations and internal quotation marks omitted); see Hawai'i Rules of Civil Procedure (HRCP) Rule 56(b) (1990). "A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Hulsman v. Hemmeter Dev. Corp.*, 65 Haw. 58, 61, 647 P.2d 713, 716 (1982) (citations omitted).

*Estate of Doe v. Paul Revere Ins. Group*, 86 Hawai'i 262, 269–70, 948 P.2d 1103, 1110–11 (1997) (quoting *Morinoue v. Roy*, 86 Hawai'i 76, 80, 947 P.2d 944, 948 (1997)) (brackets omitted). "[W]e must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion." *Morinoue*, 86 Hawai'i at 80, 947 P.2d at 948 (quoting *Maguire v. Hilton Hotels Corp.*, 79 Hawai'i 110, 112, 899 P.2d 393, 395 (1995)) (brackets omitted). However, the moving party may prevail by "demonstrating that if the case went to trial there would be no competent evidence to support a judgment for his opponent." *First Hawaiian Bank v. Weeks*, 70 Haw. 392, 396, 772 P.2d 1187, 1190 (1989). "For if no evidence could be mustered to sustain the nonmoving party's position, a trial would be useless." *Id.* at 397, 772 P.2d at 1190 (internal quotation marks, brackets, and ellipses omitted). Furthermore, the nonmoving party "must set forth specific facts showing that there is genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." Hawai'i Rules of Civil Procedure (HRCP) Rule 56(e); *Henderson v. Professional Coatings Corp.*, 72 Haw. 387, 401, 819 P.2d 84, 92 (1991).

The nonmoving party "cannot discharge his or her burden by alleging conclusions, nor is he entitled to a trial on the basis of a hope that he can produce some evidence at that time." *Id.* (internal quotation marks omitted).

### III. *DISCUSSION*

#### A. *There Is No Genuine Issue of Material Fact That Buck's Cause of Action Accrued In October 1988.*

Buck maintains that under HRS § 657–7.3, and consistent with HRCP Rule 11, the statute of limitations period under HRS § 657–7.3 was not triggered until Buck's counsel "secured a favorable expert opinion" as to (1) Dr. Miles's violation of a legal duty and (2) the causal connection between Dr. Miles's violation and the injury. Based on the existing law and undisputed facts, we disagree.

HRS § 657–7.3 provides in relevant part:

No action for injury or death against a . . . physician . . . duly licensed or registered under the laws of the State . . . based upon such person's alleged professional negligence, shall be brought more than two years after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury[.]

Prior to the enactment of HRS § 657–7.3 in 1973, the limitation period for medical torts was governed by the general tort statute of limitations contained in the Revised Laws of Hawai'i (RLH) § 241–7 (1955) and currently codified as HRS § 657–7 (1993).[3] In *Yoshizaki v. Hilo Hospital,* 50 Haw. 150, 433 P.2d 220 (1967), a medical malpractice case, this court interpreted RLH § 241–7 and adopted what is known as the discovery rule, which provides that a cause of action "does not begin to run until the plaintiff knew or should have known of the defendant's negligence." *Id.* at 154, 433 P.2d at 223. The court reasoned that application of the discovery rule is meant to balance the need for "prompt assertion of claims" against a policy "favoring adjudication of claims on

the merits and ensuring that a party with a valid claim will be given an opportunity to present it." *Id.*

In *Jacoby v. Kaiser Foundation Hospital,* 1 Haw.App. 519, 622 P.2d 613 (1981), the Intermediate Court of Appeals (ICA) applied the discovery rule, as stated in *Yoshizaki,* to HRS § 657–7.3, holding that

HRS § 657–7.3's two-year limitation commences to run when plaintiff discovers, or through the use of reasonable diligence should have discovered, (1) the damage; (2) the violation of the duty; and (3) the causal connection between the violation of the duty and the damage.

*Id.* at 525, 622 P.2d at 617. This rule was further reaffirmed in *Yamaguchi v. Queen's Medical Center,* 65 Haw. 84, 90, 648 P.2d 689, 693–94 (1982), where this court held that the discovery rule begins to run "the moment plaintiff discovers or should have discovered the negligent act, the damage, and the causal connection between the former and the latter." We further noted that the discovery rule prevents the running of the limitations period until "the plaintiff [has] knowledge of those facts which are necessary for an actionable claim. . . ." *Id.* at 90–91 n. 10, 648 P.2d at 694 n. 10.

Relying on the discovery rule articulated in *Yoshizaki, Jacoby,* and *Yamaguchi,* Buck contends that O'Toole-Buck had only a "subjective, unsubstantiated belief" that she had a cause of action against Dr. Miles, which is, according to Buck, insufficient to trigger the statute of limitations. For this reason, Buck contends that the statute of limitations did not commence until an expert opinion was obtained on December 16, 1991 as to Dr. Miles's breach of legal duty and causation. Essentially, Buck argues that O'Toole Buck's cause of action did not accrue until her counsel could secure an expert opinion.

None of our cases support Buck's contention. For a cause of action to accrue, and thus the statute of limitations to commence under HRS § 657–7.3, legal knowledge of defendant's negligence in not re-

---

**3.** HRS § 657–7 provides:
**Damages to persons or property.** Actions for the recovery of compensation for damage or injury to persons or property shall be instituted within two years after the cause of action accrued, and not after, except as provided in section 657–13.

quired. *See Hays v. City and County of Honolulu,* 81 Hawai'i 391, 399, 917 P.2d 718, 726 (1996) ("[P]laintiff's lack of knowledge regarding a legal duty, the breach of which may have caused the plaintiff injury, will not justify application of the discovery rule."). Under the discovery rule, a plaintiff need only have *factual* knowledge of the elements necessary for an actionable claim. *See Yamaguchi,* 65 Haw. at 91 n. 10, 648 P.2d at 694 n. 10 (the discovery rule prevents the running of the limitations period until "the plaintiff [has] knowledge of those facts which are necessary for an actionable claim"). Thus, contrary to Buck's contention, an expert opinion validating the legal basis for a claim is not required in order to trigger the running of the statute of limitations set forth in HRS § 657–7.3.

 In the instant case, it is undisputed that within one month after her stroke, O'Toole–Buck had the requisite awareness of "those facts which are necessary for an actionable claim." *Yamaguchi,* 65 Haw. at 91 n. 10, 648 P.2d at 694 n. 10. By October 1988, O'Toole–Buck had discovered that (1) Dr. Miles inadequately administered her medications, (2) that she suffered a severe stroke, and (3) that the stroke was caused by the inappropriate dosage of medication. On October 3, 1988, O'Toole–Buck told Dr. Linden that she had a stroke because Dr. Miles prescribed an inadequate dose of coumadin. She further testified that by October 3, 1988, she believed she "had a stroke because [Dr. Miles] did not monitor the coumadin when he had decreased the dosage." Finally, based on her belief that Dr. Miles was negligent, O'Toole–Buck informed his staff, on October 5, 1988, that she no longer wanted Dr. Miles as her treating physician. In light of this record, we hold that O'Toole–Buck's cause of action accrued in October 1988.

Buck, however, also relies on HRCP Rule 11 to support his proposition that the statute of limitations period is tolled until counsel could obtain a favorable expert opinion as to (a) Dr. Miles's violation of a legal duty, and

(b) the causal connection between Dr. Miles's violation and O'Toole–Buck's stroke. According to Buck, "HRCP Rule 11 precludes the signing of a complaint ... [for medical malpractice] without a reasonably inquiry as to the basis for the claim[.]" Thus, Buck maintains that obtaining a favorable expert opinion regarding the issues of duty and causation is the *sine qua non* of a "reasonable inquiry." We disagree.

HRCP Rule 11 is modeled after the Federal Rules of Civil Procedure (FRCP) Rule 11, before its 1993 amendments, and reads as follows:

> Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated.... The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by exiting law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

The primary purpose of Rule 11 is to "set a more demanding standard for establishing the propriety of court filings," *Lepere v. United Public Workers, Local 646, AFL–CIO,* 77 Hawai'i 471, 473–74, 887 P.2d 1029, 1031–32 (1995), and "deter baseless filings." *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 393, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). *See also* FRCP Rule 11, advisory committee notes ("The word 'sanctions' in the caption ... stresses a deterrent orientation in dealing with improper pleadings, motions, and other papers."). In order to effectuate such purposes, Rule 11 imposes an affirmative duty on an attorney to conduct "reasonable[ 4] inquiry" before filing a claim, defense, motion, or other papers.

4. Whether the investigation was "reasonable" depends on the circumstances of each situation. The reasonableness standard embodied in Rule 11 is flexible and includes the following factors:

> [H]ow much time for investigation was available to the signer; whether he had to rely on a client for information as to the facts underlying the pleading, motion, or other paper; whether

As discussed above, under the discovery rule, the statute of limitations begins to run "the moment [the] plaintiff discovers or should have discovered the negligent act, the damage, and the causal connection between the former and the latter." *Yamaguchi,* 65 Haw. at 90, 648 P.2d at 693–94. This being the case, once the plaintiff satisfies the discovery rule, the cause of action has accrued and the plaintiff has the right to file a lawsuit. It also stands to reason that plaintiff's counsel may thereafter file a complaint in compliance with HRCP Rule 11 based upon an inquiry that establishes facts sufficient to satisfy the discovery rule.

In the instant case, O'Toole–Buck believed that she had a legitimate claim for medical malpractice against Dr. Miles. According to O'Toole–Buck, Dr. Miles caused her stroke because he inadequately decreased her coumadin dosage and failed to monitor her status. *See* discussion *supra.* Between November 1988 and February 1989, her attorney obtained medical records relevant to the case and forwarded them to three health care professionals. Although the health care professionals opined that it would be difficult to prove a breach of duty of care, all three identified the causal connection between O'Toole–Buck's low coumadin levels and her stroke. Based on these facts, counsel clearly satisfied the requirements of the discovery rule *and* conducted a "reasonable inquiry" of the claim for the purposes of HRCP Rule 11.

Accordingly, although an expert opinion may aid the jury, or even be necessary, in its determination of the merits of the case, we decline to hold that HRS § 657–7.3 or HRCP Rule 11 requires the procurement of a favorable expert opinion before a cause of action accrues.

B. *A Genuine Issue of Material Fact Exists As To Whether O'Toole–Buck Was Mentally Incompetent At The Time Her Cause of Action Accrued.*

HRS § 657–13 provides in relevant part:

the pleading, motion, or other paper was based on a plausible view of the law; or whether he depended on forwarding counsel or another member of the bar.
FRCP Rule 11, advisory committee notes. *See also* Eric K. Yamamoto and Danielle K. Hart,

If any person entitled to bring any action specified in this part (excepting actions against the sheriff, chief of police, or other officers) is, at the time the cause of action accrued ... [i]nsane[,] ... such person shall be at liberty to bring such actions within the respective times limited in this part, after the disability is removed or at any time while the disability exists.

In *Zator v. State Farm Mutual Automobile Insurance Company,* 69 Haw. 594, 752 P.2d 1073 (1988), this court held that the "insanity" provision of HRS § 657–13(2) tolled the no-fault statute of limitations when a claimant is mentally incompetent at the time the cause of action accrues. *Id.* at 598, 752 P.2d at 1075. *See also Gorospe v. Matsui,* 72 Haw. 377, 819 P.2d 80 (1991) (applying the tolling provision in HRS § 657–13 to toll the no-fault statute of limitations for minority plaintiffs). We further held that once a guardian is appointed for the incompetent person's property, the limitation period commences. *Zator,* 69 Haw. at 599, 752 P.2d at 1076.

In this case, it is undisputed that Buck commenced the instant action thirty-nine months after O'Toole–Buck's claim for relief accrued. Buck, nevertheless, claims that O'Toole–Buck was "insane" at the time the action accrued, thus raising the issue of the applicability of the tolling provision of HRS § 657–13(2).

As a preliminary matter, it is important to note that the word "insane" in the context of HRS § 657–13 has never been defined by the either the legislature or the courts. In *Christian v. Waialua Agricultural Co.,* 31 Haw. 817 (1931), we briefly discussed the term "insanity" as it applied to rescission of a deed or contract, stating:

The test generally agreed upon is this: A deed or contract cannot be set aside on the ground of insanity if the person had sufficient mental capacity to understand in a reasonable manner the nature of the par-

*Rule 11 and State Courts: Panacea or Pandora's Box?,* 13 Univ. Haw. Law. Rev. 57, 70–71 (1991) (stating that the reasonableness standard "should not impose unduly onerous or unrealistic investigative burdens upon counsel") (footnote omitted).

ticular transaction in which he was engaged and its consequences and effects upon his rights and interest.... The proper inquiry is whether he was capable of understanding and appreciating the nature and effect of the one particular act or transaction which is challenged.

*Id.* at 822. Other jurisdictions examining the meaning of insanity in the context of tolling the statute of limitations have liberally defined the term as: (1) the inability to understand one's legal rights or manage one's affairs, *see Adkins v. Nabors Alaska Drilling Inc.,,* 609 P.2d 15, 23 (Alaska 1980); *Allen v. Powell's Int'l, Inc.,* 21 Ariz.App. 269, 518 P.2d 588, 589 (Ariz.App.1974); *Davidson v. Baker Vander Veen Constr. Co.,* 35 Mich. App. 293, 192 N.W.2d 312, 316 n. 4 (Mich. App.1971); (2) the inability to understand the nature or effect of one's acts, *see Peach v. Peach,* 73 Ill.App.2d 72, 218 N.E.2d 504, 509 (Ill.App.1966); *Hornig v. Hornig,* 6 Mass. App.Ct. 109, 374 N.E.2d 289, 291 (Mass.App. Ct.1978); or (3) the inability to carry out one's business and prosecute the claim, *See Harrington v. County of Ramsey,* 279 N.W.2d 791, 795 (Minn.1979); *Cline v. Lever Bros. Co.,* 124 Ga.App. 22, 183 S.E.2d 63 (Ga.App.1971).

With these definitions in mind, we turn to the record in this case. In opposition to Dr. Miles's motion for summary judgment, Buck submitted, among other things, a psychological evaluation from a clinical psychologist and sworn affidavits of two additional mental health professionals, each opining that O'Toole–Buck was "mentally incompetent to manage her legal and business affairs" subsequent to her stroke on September 18, 1988.

The general rule is that material in support of, or in opposition to, a motion for summary judgment must "set forth such facts as would be admissible in evidence." HRCP Rule 56(e). "To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of ... Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." *Takaki v. Allied Machinery Corp.,* 87 Hawai'i 57, 69, 951 P.2d 507, 519 (App.1998) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil* § 2722, at 58–60 (2d ed.1983) (brackets omitted)).

It does not appear that Dr. Greene's psychological evaluation was supported by any appropriate affidavit or certification pursuant to the foregoing requirements. For this reason, Dr. Greene's evaluation must be excluded from consideration. This being the case, we now examine the affidavits of the psychiatrist, Shepard Ginandes, M.D., and the neuropsychologist, Robert Sbordone, Ph.D.

"Affidavits in a summary judgment motion are scrutinized to determine whether the facts they aver are admissible at trial and made on the personal knowledge of the affiant." *Miller v. Manuel,* 9 Haw.App. 56, 66, 828 P.2d 286, 292 (1991). *See also* HRCP Rule 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."). Here, Dr. Ginandes's affidavit was based on his personal knowledge of the record and examination of O'Toole–Buck. He indicated that O'Toole–Buck suffered from "significat [sic] neuropsychiatric deficits involving marked impairment of her remote and recent memory, judgment, decision-making capacity, cognition, comprehension, and suppression" as a result of her stroke on September 18, 1988. Dr. Ginandes further opined, "to a high degree of psychiatric certainty, that Mrs. O'Toole–Buck was not mentally competent to manage her business or legal affairs since September 18, 1988." He also stated that, given the severity of O'Toole–Buck's mental incompetence and incapacity, she would "remain mentally incompetent and unable to manage her business or legal affairs for the duration of her life[.]"

Dr. Sbordone also personally attested in his affidavit that O'Toole–Buck "sustain[ed] infarctions in the left temporal lobe or along the middle cerebral artery, which extends anteriorly into the left frontal lobe and posteriorly into the parietal lobe," resulting in O'Toole–Buck exhibiting "significant impairments on tasks which involved sustained attention, vigilance, cognitive flexibility, set

maintenance, cognitive processing speed, verbal fluency, receptive language processing, verbal learning, verbal and visual memory, higher-order motor/executive functions, proverb interpretation, judgment, problem solving, organization and planning." Dr. Sbordone thus opined that O'Toole–Buck "was not mentally competent to manage her business or legal affairs" and that her mental incompetence was a direct result of her stroke on September 18, 1988.

■ The averments in the affidavits submitted by Dr. Ginandes and Dr. Sbordone provide an adequate basis upon which a trier of fact could find inferentially that O'Toole–Buck was suffering from a mental defect that prevented her both from comprehending and managing her personal affairs and from understanding the nature or effect of her actions. The fact that O'Toole–Buck retained counsel and settled an unrelated lawsuit is some evidence that she was "sane," but does not conclusively establish that fact. *See Harrington,* 279 N.W.2d at 796 ("[T]he retention of counsel is evidence, although not conclusive, of a person's sanity or legal capacity for the purpose of the running of the statute of limitations."); *Davidson,* 192 N.W.2d at 312 ("We are not prepared to say that ability to retain a lawyer is conclusive evidence of mental competence for the purposes of this tolling provision."). Thus, considering the definition of insanity and construing the motion liberally in favor of Buck, we hold that the averments in the affidavits of Dr. Ginandes and Dr. Sbordone were suffi-

cient to invoke the tolling provision in HRS § 657–13.

We stress that this holding is not a determination that O'Toole–Buck was insane during the time alleged, but merely that a genuine issue of material fact exists as to O'Toole–Buck's sanity. Whether or not the specific mental malady pled in Buck's motion in opposition and affidavits constituted or resulted in O'Toole–Buck's insanity is a question to be determined by the trier of fact and should not be decided summarily as a matter of law.

Accordingly, we vacate and remand the case for further consideration of the issue. If, on remand, the circuit court ultimately rules that O'Toole–Buck was mentally incompetent for the period September 18, 1988 through December 4, 1991, the date in which Buck was appointed guardian, the two-year limitation period under HRS § 657–7.3 would have been tolled by reason of incompetence during this thirty-eight month period.

## IV. CONCLUSION

For the foregoing reasons, we vacate the circuit court's order granting Dr. Miles's renewed motion for summary judgment and remand the case for further proceedings consistent with this opinion.